Case No. 17-11315

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

COMMON CAUSE and
GEORGIA STATE CONFERENCE OF THE NAACP,

Plaintiffs-Appellants,

v.

BRIAN KEMP, individually and in his official capacity as
Secretary of State of the State of Georgia,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
District Court Case No. 1:16-cv-452-TCB

---

## PRINCIPAL BRIEF OF APPELLANTS

---

Emmet J. Bondurant
Georgia Bar No. 066900
bondurant@bmelaw.com
Jason J. Carter
Georgia Bar No. 141669
carter@bmelaw.com
Chad K. Lennon
Georgia Bar No. 408953
lennon@bmelaw.com

**BONDURANT MIXSON & ELMORE LLP**
3900 One Atlantic Center
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Telephone: (404) 881-4100

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for Plaintiffs-Appellants Common Cause and Georgia State Conference of the NAACP certifies that the following have an interest in the outcome of this appeal:

- Anderson, Julia B. (Senior Assistant Attorney General and Counsel for Defendant-Appellee)

- Batten, Timothy C., Sr. (United States District Judge)

- Bondurant, Emmet J., II (Counsel for Plaintiffs-Appellants)

- Bondurant Mixson & Elmore LLP (Counsel for Plaintiffs-Appellants)

- Carr, Christopher Michael (Attorney General and Counsel for Defendant-Appellee)

- Carter, Jason James (Counsel for Plaintiffs-Appellants)

- Common Cause, a nonprofit corporation organized and existing under the laws of the District of Columbia (Plaintiff-Appellant)

- Correia, Cristina Marie (Assistant Attorney General and Counsel for Defendant-Appellee)

- Dellheim, Richard A. (Attorney, Voting Section, Civil Rights Division, United States Department of Justice, and Counsel for Interested Party the United States)

- Dunn, Dennis R. (Chief Deputy Attorney General and Counsel for Defendant-Appellee)

- Georgia State Conference of the NAACP, an unincorporated chapter of the National Association for the Advancement of Colored People, which is a nonprofit corporation organized and existing under the laws of the State of New York (Plaintiff-Appellant)

- Gupta, Vanita (Principal Deputy Assistant Attorney General, Civil Rights Division, United States Department of Justice, and Counsel for Interested Party the United States)

- Heidt, Josiah Benjamin (Assistant Attorney General and Counsel for Defendant-Appellee)

- Herren, T. Christian, Jr. (Attorney, Voting Section, Civil Rights Division, United States Department of Justice, and Counsel for Interested Party the United States)

- Horn, John A. (United States Attorney, Northern District of Georgia, and Counsel for Interested Party the United States)

- Kemp, Brian (Defendant-Appellee)

- Lennon, Chad K. (Counsel for Plaintiffs-Appellants)

- Mendel, Gabriel A. (Assistant United States Attorney, Northern District of Georgia, and Counsel for Interested Party the United States)

- Olens, Samuel S. (Former Attorney General and Former Counsel for Defendant-Appellee)

- Oliker-Friedland, Samuel G. (Attorney, Voting Section, Civil Rights Division, United States Department of Justice, and Counsel for Interested Party the United States)

- The United States (Interested Party)

- Willard, Russell D. (Senior Assistant Attorney General and Counsel for Defendant-Appellee)

No publicly traded company or corporation has an interest in the outcome of the case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument because it would significantly aid this Court's decisional process. *See* FED. R. APP. P. 34(a)(2)(C); 11th Cir. R. 34-3(b)(3). Oral argument would help the Court analyze the National Voter Registration Act of 1993 and its amendment by the Help America Vote Act of 2002. The District Court's interpretation directly conflicts with the only Court of Appeals opinion on point, and if affirmed would create a split among the circuits. *See* **(Doc. 34 at 10–11)** (the District Court refusing to follow *A. Philip Randolph Institute v. Husted*, 838 F.3d 699 (6th Cir. 2016), *cert. granted*, 2017 WL 515274 (May 30, 2017), despite recognizing that it is directly on point).

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ...................................................................... C-1

Statement Regarding Oral Argument ........................................................ i

Table of Contents .................................................................................. ii

Table of Citations ................................................................................. iv

Statement of Subject-Matter and Appellate Jurisdiction ..................... viii

Statement of the Issues.......................................................................... 1

Statement of the Case ............................................................................ 2

I.   The Course of Proceedings and Dispositions in the Court Below ............................................................................. 3

II.  Statement of the Facts ..................................................................... 5

    A.   The National Voter Registration Act of 1993 ......................... 6

        1.   Subsection 8(b): the Failure-to-Vote Prohibition....................................................................... 7

        2.   HAVA: the Except-That Clause.................................... 9

        3.   Subsection 8(c): the USPS Safe-Harbor Procedure..................................................................... 9

        4.   Subsection 8(d): the Address-Confirmation Procedure................................................................... 10

    B.   The Georgia Election Code.................................................... 11

    C.   The Ruling of the District Court........................................... 13

Standard of Review .............................................................................. 15

Summary of the Argument .................................................................... 16

Argument and Citations of Authority.................................................21

I.    Section 21-2-234 violates the NVRA..........................................21

      A.    Section 234 "result[s] in the removal of" voters "by
            reason of [their] failure to vote," in violation of the
            NVRA's Failure-to-Vote Prohibition....................................22

      B.    The District Court's contrary interpretation
            ignores both the NVRA's express language and its
            structure...............................................................26

II.   HAVA does not render Section 234 lawful. ...............................30

      A.    HAVA does not authorize any voter-removal
            program that would have been unlawful under the
            pre-HAVA NVRA. .................................................30

      B.    In any event, Section 234 does not comply with
            HAVA's Except-That Clause.......................................31

      C.    HAVA's Except-That Clause merely clarified an
            arguable inconsistency between the Failure-to-
            Vote Prohibition and the Address-Confirmation
            Procedure..............................................................34

III.  The District Court erred by dismissing Plaintiffs' First
      Amendment Claim, particularly on a motion to dismiss
      with a bare record. .......................................................36

      A.    The right not to vote is protected by the First
            Amendment. .......................................................37

      B.    The District Court applied the wrong level of First
            Amendment scrutiny..............................................39

      C.    The District Court erred by holding, on the basis
            of a bare record, that Section 234 is
            constitutionally permissible.....................................41

Conclusion ...........................................................................46

# Table of Citations

## Cases

*A. Philip Randolph Institute v. Husted*, 838 F.3d 699 (6th Cir. 2016).................................................................. passim

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .................................. 45

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013) ........................................................................ 6

*Bautista v. Star Cruises*, 396 F.3d 1289 (11th Cir. 2005) .............. 21

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519 (1947) ....................................................................... 36

*Blevins v. Aksut*, 849 F.3d 1016 (11th Cir. 2017) ........................... 15

*Brown v. Henderson*, 257 F.3d 246 (2d Cir. 2001) .................... 26, 46

*Burdick v. Takushi*, 937 F.2d 415 (9th Cir. 1991) ......................... 44

*Burns v. Fortson*, 410 U.S. 686 (1973) ........................................... 45

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010)...................................................... 44

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)........ 44

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) ..... 44

*Connecticut v. Teal*, 457 U.S. 440 (1982) ....................................... 25

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) ................................................................ 44

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)............. 7

*Curves, LLC v. Spalding Cty.*, 685 F.3d 1284 (11th Cir. 2012)...... 41

*Dixon v. Md. State Admin. Bd. of Election Laws*, 878 F.2d 776 (4th Cir. 1989) .............................................................................. 38

*Donaire v. NME Hosp., Inc.*, 27 F.3d 507 (11th Cir. 1994) ............ 26

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................ 18, 37

*Hoffman v. Maryland*, 928 F.2d 646 (4th Cir. 1991) .... 38, 40, 42, 43

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) .............. 45

*Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) ................. 25

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ....................... 19, 39

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) ................................... 45

*Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194 (11th Cir. 2016).... 15

*Stein v. Ala. Sec'y of State*, 774 F.3d 689 (11th Cir. 2014) ............. 45

*Storer v. Brown*, 415 U.S. 724 (1974) .............................................. 46

*Summum v. Pleasant Grove City*, 483 F.3d 1044 (10th Cir. 2007) .............................................................................................. 44

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ...... 44

*United States v. Alvarez,* 132 S. Ct. 2537 (2013) ....................... 19, 39

*United States v. O'Brien*, 391 U.S. 367 (1968) ............. 19, 40, 41, 45

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ......................................... 37

*Yates v. United States*, 135 S. Ct. 1074 (2015) ............................... 29

**Statutes**

28 U.S.C. § 1291 ....................................................... vii

28 U.S.C. § 1331 ....................................................... vii

28 U.S.C. § 1343 ....................................................... vii

42 U.S.C. § 1981 ........................................................ 26

42 U.S.C. § 2000e-2 .................................................. 25

52 U.S.C. § 20501 ................................................... 2, 6

52 U.S.C. § 20504 ....................................................... 6

52 U.S.C. § 20505 ....................................................... 6

52 U.S.C. § 20507 ............................................... passim

52 U.S.C. § 20510 ..................................................... vii

52 U.S.C. § 21083 ..................................................... 31

52 U.S.C. § 21145 ......................................... 16, 30, 35

O.C.G.A. § 21-2-231 ................................................. 11

O.C.G.A. § 21-2-232 ................................................. 11

O.C.G.A. § 21-2-233 ............................................ 10, 11

O.C.G.A. § 21-2-234 ........................................... passim

O.C.G.A. § 21-2-235 ................................................. 13

O.C.G.A. § 21-2-431 ................................................. 12

Pub. L. No. 103-31, 107 Stat. 77 ............................... 6

Pub. L. No. 107-252, 116 Stat. 1666 ................. 9, 31, 35

**Other Authorities**

11th Cir. R. 34-3 ....................................................................................i

Antonin Scalia & Bryan A. Garner, Reading Law: the
    Interpretation of Legal Texts (2012) ......................................33

Fed. R. App. P. 34 .................................................................................i

H.R. Rep. No. 103-9 (1993)...........................................................23, 30

S. Rep. No. 103-6 (1993)...................................................................38

U.S. Election Assistance Commission Report to the 114th
    Congress: *The 2014 EAC Election Administration and Voting
    Survey Comprehensive Report* (June 30, 2015).........................4, 13

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This is an appeal from a final judgment of the United States District Court for the Northern District of Georgia, Atlanta Division, entered on March 17, 2017. The judgment dismissed Plaintiffs-Appellants' complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). **(Doc. 34)**. The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), and under 52 U.S.C. § 20510(b)(2). Plaintiffs filed a timely notice of appeal on March 23, 2017. **(Doc. 36)**. This Court has jurisdiction under 28 U.S.C. § 1291.

1.     The National Voter Registration Act of 1993 governs the way States may remove voters from their voter rolls. Among other things, the NVRA requires States to adopt a program that makes a reasonable effort to remove ineligible voters from their rolls. 52 U.S.C. § 20507(a)(4). The NVRA subjects state voter-removal programs to an important restriction: the programs "shall not result in the removal" of any voter "by reason of the person's failure to vote." *Id.* § 20507(b)(2). One of Georgia's voter-removal programs, O.C.G.A. § 21-2-234, requires the Georgia Secretary of State to initiate voter-removal proceedings against voters who have not voted (or had other voting-related "contact" with election officials) for three years. Does this Georgia statute violate the NVRA?

2.     The First Amendment to the United States Constitution protects the right of eligible citizens to express themselves by voting, and it also protects their right to express themselves by *not voting*. Does O.C.G.A. § 21-2-234 violate the First Amendment by penalizing eligible voters for exercising their First Amendment right not to vote?

This is an action to prevent the Georgia Secretary of State from violating the National Voter Registration Act of 1993, 52 U.S.C. § 20501. The NVRA prohibits States from removing people from voter rolls except in limited circumstances. *Id.* § 20507(a)(3). As relevant to this case, the NVRA allows States to remove voters only as part of a "general program that makes a reasonable effort to remove the names of ineligible voters." *Id.* § 20507(a)(4). The NVRA restricts these mandatory voter-removal programs in several ways. *Id.* § 20507(a)(4)(B), (b)–(d). Crucially for this case, the NVRA provides that any State voter-removal program "shall not result in the removal" of any voter "by reason of the person's failure to vote." *Id.* § 20507(b)(2).

The Georgia Election Code contains several voter-removal programs that meet all the affirmative requirements of the NVRA. Plaintiffs challenge only one: the program in O.C.G.A. § 21-2-234, which goes beyond the NVRA's affirmative requirements. Under Section 234, the Secretary initiates removal proceedings against voters based on their failure to vote (or make other voting-related "contact") for three

years. Put simply, this program violates the NVRA because it "result[s] in the removal" of voters "by reason of [their] failure to vote," § 20507(b)(2).

Just last year the United States Court of Appeals for the Sixth Circuit held that a substantially identical voter-removal program conducted by the State of Ohio violates the NVRA. *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699 (6th Cir. 2016), *cert. granted*, 2017 WL 515274 (May 30, 2017). Georgia's Section 234 voter-removal program is unlawful for the same reasons. The District Court recognized that the Sixth Circuit's *Husted* opinion was on point, but declined to follow it. **(Doc. 34 at 10–11)**. If affirmed, the District Court's misinterpretation of the NVRA would create a split among the Circuits. This Court should reverse.

In addition to violating the NVRA, Georgia's Section 234 violates the First Amendment because it penalizes citizens for exercising their fundamental right to express themselves by not voting.

## I.   The Course of Proceedings and Dispositions in the Court Below

Plaintiffs-Appellants, Common Cause and the Georgia State Conference of the NAACP, filed a complaint in the U.S. District Court

for the Northern District of Georgia on February 10, 2016. **(Doc. 1)**.

The complaint seeks a declaratory judgment that Section 234 violates

the NVRA and the First Amendment, and an injunction prohibiting the

Georgia Secretary of State from enforcing Section 234 by purging

registered voters based on their failure to vote.

The complaint alleges that in a single two-year period, the

Secretary removed 372,242 Georgia voters "due to failure to vote."

**(Doc. 1 ¶ 33)**; U.S. Election Assistance Commission Report to the

114th Congress: *The 2014 EAC Election Administration and Voting*

*Survey Comprehensive Report,* at 106 (June 30, 2015), https://www.eac.

gov/assets/1/1/2014_EAC_EAVS_Comprehensive_Report_508_Complian

t.pdf. This exceeded by almost 100,000 the number of Georgia voters

removed during the same period for moving out of the jurisdiction. *See*

EAC Report at 106 (276,461 voters removed for moving from Georgia).

And the number of Georgia voters removed due to "failure to vote"

exceeded even the total number of new registrants during the same

period. **(Doc. 1 ¶ 34)**; EAC Report at 98 (364,382 new registrants).

In March 2016, the Secretary moved to dismiss for failure to state

a claim, **(Doc. 10)**, and discovery was stayed pending a ruling on the

Secretary's motion. **(Doc. 14)**. The U.S. Department of Justice filed a Statement of Interest in support of Plaintiffs. **(Doc. 19)**. On March 17, 2017, the District Court granted the motion to dismiss, **(Doc. 34)**, and entered final judgment in the Secretary's favor, **(Doc. 35)**. Plaintiffs filed their notice of appeal on March 23, 2017. **(Doc. 36)**.

## II.    Statement of the Facts

This appeal presents pure questions of statutory interpretation. Because the District Court dismissed for failure to state a claim, the facts in the complaint are taken as true and no facts are in dispute.

The NVRA prohibits State voter-removal programs that "result in the removal" of voters "by reason of [their] failure to vote." 52 U.S.C. § 20507(b)(2). One of Georgia's voter-removal programs initiates removal proceedings against voters by reason of their failure to vote, and the program thus results in their removal for this same prohibited reason. O.C.G.A. § 21-2-234. Plaintiffs argue that the Georgia statute violates the NVRA; the Secretary insists it does not. The question for this Court is whose interpretation of the NVRA is correct.

Because no facts are in dispute, this statement of facts outlines the NVRA and a related federal statute, the Help America Vote Act of

2002, and it then describes Georgia's voter-removal program, as alleged in the Complaint.

A. <u>The National Voter Registration Act of 1993</u>

The National Voter Registration Act of 1993 was enacted to "increase the number . . . [and] enhance . . . participation of eligible citizens as voters," and to "ensure that accurate voter registration rolls are maintained." 52 U.S.C. § 20501(b). Congress passed the NVRA out of a concern that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation," which it described as a "fundamental right." *Id.* §20501(a).[1]

The portion of the NVRA relevant to this case is generally referred to as Section 8. *See* Pub. L. No. 103-31, § 8, 107 Stat. 77, 82–87. That section, which is codified at 52 U.S.C. § 20507, requires States to maintain accurate voter rolls by making reasonable efforts to remove ineligible voters. At the same time, Section 8 regulates the procedures

---

[1] The NVRA is perhaps best known for simplifying voter registration through its "motor voter" provision, which requires States to allow voter registration in driver's license applications, 52 U.S.C. § 20504 (a)(1), and by mail using a standard form, *id.* § 20505(a). *See generally Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013).

States may use to remove voters. *Id.*; *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 192 (2008) (Section 8 "restrict[s] States' ability to remove names from the list of registered voters"); *Husted*, 838 F.3d at 705–06 ("Section 8's language pairs the [NVRA's] mandate that states maintain accurate voter rolls with multiple constraints on how the states may go about doing so.").

Under subsections 8(a)(3) and (4), a State may remove a voter for ***only*** a handful of reasons: (1) at the voter's request; (2) due to criminal conviction, mental incapacity, or death; or (3) "by reason of . . . a change in the residence of the [voter]." § 20507(a)(3), (4).

State programs to remove voters for this last reason—"a change in residence"—must be "in accordance with subsections (b), (c), and (d)" of the NVRA's Section 8. *Id.* § 20507(a)(4)(B). Each of these subsections is discussed in turn.

### 1. Subsection 8(b): the Failure-to-Vote Prohibition

As relevant here, subsection 8(b) prohibits voter-removal programs that "result in the removal of the name of any person . . . by reason of the person's failure to vote" *Id.* § 20507(b). This prohibition,

which this brief refers to as the "Failure-to-Vote Prohibition," is at the center of this appeal.[2]

As originally enacted, subsection 8(b) stated:

Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—

(1) shall be uniform [and] nondiscriminatory …

(2) ***shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote.***

*Id.* § 20507(b) (emphasis added).

---

[2] Indeed, subsection 8(b)'s Failure-to-Vote Prohibition is at the center of the NVRA itself. One of Congress' principal concerns in enacting the NVRA was outlawing State programs that removed voters for not voting:

> [W]hile voting is a right, people have an equal right not to vote, for whatever reason. However, many States continue to penalize such non-voters by removing their names from the voter registration rolls merely because they have failed to cast a ballot in a recent election[,] [even though] [s]uch citizens may not have moved or died or committed a felony. Their only "crime" was not to have voted in a recent election. . . . No other rights guaranteed to citizens are bound by the constant exercise of th[ose] right[s]. We do not lose our right to free speech because we do not speak out on every issue.

S. REP. NO. 103-6, at 17 (internal quotation marks omitted).

## 2. *HAVA: the Except-That Clause*

In 2002, Congress adopted the Help America Vote Act ("HAVA").

Section 903 of HAVA appended an "Except-That Clause" to the NVRA's

subsection 8(b)(2). HAVA's Except-That Clause provides:

> except that nothing in this paragraph may be construed to
> prohibit a State ***from using the procedures described in
> subsections (c) and (d) to remove an individual*** from
> the official list of eligible voters if the individual –
>
> (A)   has not either notified the applicable registrar (in
>        person or in writing) or responded during the
>        period described in subparagraph (B) to the
>        notice sent by the applicable registrar; and then
> (B)   has not voted or appeared to vote in 2 or more
>        consecutive elections for Federal office.

Pub. L. No. 107-252 § 903, 116 Stat. 1666, 1728 (emphasis added).

Thus, as amended by HAVA, subsection 8(b)(2) of the NVRA

prohibits State programs that result in the removal a voter by reason of

her failure to vote, unless the State uses the procedures in subsections

8(c) and (d) to remove the voter. § 20507(b)(2).

## 3. *Subsection 8(c): the USPS Safe-Harbor Procedure*

Subsection 8(c) is a safe-harbor procedure. It provides: "A State

may meet the requirement of subsection (a)(4) [*i.e.*, the subsection that

requires a general program to remove ineligible voters] by [using] . . .

change-of-address information supplied by the Postal Service . . . to

identify registrants whose addresses may have changed." *Id.*

§ 20507(c)(1). This brief refers to subsection 8(c) as the "USPS Safe

Harbor Procedure." Georgia has adopted the USPS Safe Harbor

Procedure in O.C.G.A. § 21-2-233, and Plaintiffs do not challenge the

Section 233 procedure.

### 4. Subsection 8(d): the Address-Confirmation Procedure

Subsection 8(d) of the NVRA is a final requirement States must

meet before removing a voter for changing residences. Under subsection

8(d), a voter may not be removed for a change in residence unless three

conditions are met: (1) the State has sent the voter an address-

confirmation notice; (2) the voter has failed to respond to the notice

within 30 days; and (3) the voter has then failed to vote in the next two

Federal elections. § 20507(d). This brief refers to subsection 8(d) as the

Address-Confirmation Procedure.

The NVRA states, in multiple places, that this Address-

Confirmation Procedure is an additional restriction that applies to any

voter-removal program based on change of residence. *See*

§ 20507(a)(4)(B) (voter-removal program based on change of residence

must be "in accordance with subsections (b), (c) ***and (d)***" (emphasis

added)). This expressly includes the USPS Safe Harbor Procedure of subsection (c). Under that subsection, a State may not remove a voter who appears to have moved according to the USPS database until it complies with "the notice procedure described in subsection (d)(2) to confirm the change of address." *Id.* § 20507(c)(1)(B)(ii) (providing that even "if it appears from information provided by the Postal Service that . . . the registrant has moved to a different . . . address not in the . . . jurisdiction," the State cannot remove the voter until it complies with "the notice procedure described in subsection (d)(2) to confirm the change of address").

B. <u>The Georgia Election Code</u>

After the NVRA was enacted in 1993, Georgia (along with many other states) adopted a new election code in an effort to conform to the NVRA's requirements. Except for O.C.G.A. § 21-2-234, Georgia's voter-removal programs all comply with the NVRA. *See, e.g.*, O.C.G.A. § 21-2-231(a) (removal of voters for felony convictions); *id.* § 21-2-231(b) (mental incapacity); *id.* § 21-2-231(d) (death); *id.* § 21-2-232 (registration to vote in another state); *id.* § 21-2-233 (change of residence based on information from the USPS change-of-address

database, in compliance with the USPS Safe Harbor Procedure in subsection 8(c) of the NVRA).

But one of Georgia's voter-removal programs, O.C.G.A. § 21-2-234, violates the NVRA. Section 234 requires the Secretary to initiate voter-removal proceedings against voters who have failed to vote (or make other voting-related "contact" with election officials) for three years. Section 234 provides in pertinent part:

> In the first six months of each odd-numbered year, the Secretary of State shall identify all electors whose names appear on the list of electors with whom there has been no contact[3] during the preceding three calendar years and who were not identified as changing addresses under Code Section 21-2-233.

---

[3] Georgia's Election Code defines "no contact" as follows:
> the elector has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, and has not confirmed the elector's continuation at the same address.

§ 21-2-234(a)(1); *see also id.* § 21-2-235(b).

While this definition of "no contact" does not expressly include failure to vote, "sign[ing] a voter's certificate" is the equivalent of voting in Georgia. *See* O.C.G.A. § 21-2-431(a) ("At every primary and election, each elector who desires to vote shall first execute a voter's certificate . . . ."); *see also* **(Doc. 34 at 12)** ("Because voter's certificates are []signed only at voting polls, a failure to sign such a certificate is a direct indication of a failure to vote."); **(Doc. 42 at 26:18–19)**.

After identifying voters who have made "no contact," the Secretary sends address-confirmation notices to those voters. A voter who receives an address-confirmation notice must respond within 30 days.[4] This is true even "if the elector has not changed addresses"—and therefore is still eligible to vote. If the voter fails to respond within 30 days, her name is transferred to a list of "inactive" voters. O.C.G.A. § 21-2-234(c)(2). If she fails to vote in the next two general elections, she will be removed from the voter-registration rolls. *Id.* § 21-2-235.

In 1994, the U.S. Department of Justice notified the State of Georgia that Section 234 violates the NVRA because it "result[s] in the removal" of voters by reason of their failure to vote. **(Doc. 1-1)**.

C. <u>The Ruling of the District Court</u>

The District Court ruled that Section 234 does not violate the NVRA. The court agreed with Plaintiffs that Section 234 initiates voter-removal proceedings against voters based on their failure to vote, and indeed found the Secretary's contrary argument "disingenuous."[5] But

---

[4] The U.S. Election Assistance Commission reports that the national average return rate of address-confirmation notices is only 20%. EAC Report at 23.

[5] The District Court firmly rejected the Secretary's argument that Section 234 is lawful because it targets voters who make no "contact,"

the District Court nonetheless held that the NVRA "is silent on when and how a state may decide to send out notifications." **(Doc. 34 at 13)** ("[T]here is no explicit statutory language governing 'trigger' provisions.").

This holding is in direct conflict with the decision of the only Court of Appeals to consider this question. The Court of Appeals for the Sixth Circuit held that a nearly identical Ohio voter-removal program violates the NVRA. *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699 (6th Cir. 2016), *cert. granted*, 2017 WL 515274 (May 30, 2017). The District Court acknowledged *Husted* but declined to follow it. **(Doc. 34 at 10)**.

The District Court also dismissed Plaintiffs' First Amendment claims. The court assumed, without deciding, that voters have a First Amendment right not to vote. But the court ruled that Section 234 is a reasonable "time, place, or manner" restriction, and that its restriction is supported by a substantial governmental interest. **(Doc. 34 at 16–21)**.

---

rather than voters who fail to vote. The court explained that this argument was "disingenuous," because "the inclusion of other, extraneous methods of establishing contact does not diminish the fact that failure to vote is necessary to trigger the notification provision." **(Doc. 34 at 12)**.

## STANDARD OF REVIEW

This Court reviews de novo the dismissal of a complaint for failure to state a claim. *Blevins v. Aksut*, 849 F.3d 1016, 1018–19 (11th Cir. 2017); *see also Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1199 (11th Cir. 2016) (questions of statutory interpretation are reviewed de novo). The allegations in the complaint are accepted as true and construed in the light most favorable to Plaintiffs.

The ruling of the District Court is inconsistent with the plain language of the NVRA and the decision of the Sixth Circuit—the only Court of Appeals to address this question. The District Court's dismissal of Plaintiffs' claims should be reversed.

Contrary to the District Court's holding, Georgia's Section 234 does violate the NVRA because it "result[s] in the removal of [voters] . . . by reason of [their] failure to vote." Part I of this brief's argument section explains this conclusion and addresses the Secretary's contrary arguments.

The Secretary also argues that Section 234 is saved by HAVA's amendment to the NVRA. This is incorrect for two reasons: First, HAVA itself states that "nothing" in HAVA—including the "Except-That Clause" appended to subsection 8(b)(2) of the NVRA—"may be construed to authorize . . . conduct prohibited under [the NVRA] . . . or supersede, restrict, or limit the application of" the NVRA. 52 U.S.C. § 21145(a). "Nothing" means nothing. So HAVA cannot authorize conduct that would have otherwise violated the NVRA.

Second and in any event, Section 234 does not satisfy the requirements of the Except-That Clause in the HAVA amendment. That clause allows a State to "us[e] the procedures in subsections [8](c) **and** (d) to remove an individual from the" voter rolls. But Georgia's Section 234 voter-removal procedure uses only one of the two required procedures—the Address-Confirmation Procedure in subsection 8(d). Section 234 does not use the USPS Safe Harbor Procedure in subsection 8(c). Satisfying subsection 8(d) alone is not sufficient to immunize a voter-removal program under HAVA's Except-That Clause. The Address-Confirmation Procedure in subsection 8(d) is not and never has been an independent, standalone method for removing voters. Instead, the NVRA has always provided that subsection 8(d) is an *additional restriction* on state programs—one more necessary step that a State must take before removing a voter under any voter-removal program that meets the other requirements of the NVRA. HAVA merely reaffirmed this conclusion. Nothing in the NVRA or HAVA makes the Address-Confirmation Procedure itself a sufficient criterion for removal. Part II explains why HAVA does not make Georgia's Section 234 procedure lawful.

The District Court's dismissal of Plaintiffs' First Amendment claim should also be reversed. Section 234 treats voters differently based on *whether or how* they exercise their First Amendment rights. Voters who choose, for whatever reason, not to vote are penalized by Section 234. They are required to respond to address-confirmation notices from the Secretary, even though the Secretary has no reason to believe they are ineligible to vote, and they are at risk of being removed for failing to vote. Voters who make the opposite choice—to vote—are not similarly burdened, nor are they at risk of being removed.

The District Court applied the wrong standard of First Amendment scrutiny by holding that Section 234 is a time, place, or manner restriction subject to only rational basis review.

To the contrary, Section 234 is a restriction on the "unfettered judgment" of certain citizens "on matters of political concern." *Elrod v. Burns*, 427 U.S. 347, 372 (1976). Protecting each citizen's ability to freely make such judgments is the primary concern of the First Amendment. *Id.* Because Section 234 burdens citizens based on how they choose to participate in our democratic system, it is a content-based restriction that demands strict scrutiny. *See, e.g., Reed v. Town of*

*Gilbert*, 135 S. Ct. 2218, 2230 (2015); *United States v. Alvarez,* 132 S. Ct. 2537, 2543–44 (2013). At a minimum, Section 234 is governed by the speech/non-speech test articulated in *United States v. O'Brien*, 391 U.S. 367 (1968), which still demands a higher level of scrutiny than that applied by the District Court. Section III.B below discusses the proper standard of review for Plaintiffs' First Amendment claim.

Further, even if the District Court applied the proper level of First Amendment scrutiny, it erred by holding as a matter of law that Section 234 is reasonable. The only evidence before the court was the allegations in Plaintiffs' complaint: that Section 234 removes hundreds of thousands of voters by reason of their failure to vote; that removals under Section 234 far outnumber removals under other voter-removal programs and even outnumber new registrants; and that Section 234 removals have imposed a substantial burden on Plaintiffs and individual voters. *See, e.g.*, **(Doc. 1 ¶¶ 2–3, 29–35)**. Deciding that Section 234 is *per se* reasonable with only a bare record on a motion to dismiss was error. Section III.C below explains this error.

The judgment of the District Court should be reversed. This Court should remand the case and direct that the Secretary be enjoined from

enforcing Section 234, and be ordered to restore to the voter rolls the people who have been illegally removed.

## ARGUMENT AND CITATIONS OF AUTHORITY

## I.    Section 21-2-234 violates the NVRA.

To interpret a statute, "the first step is to determine whether the statutory language has a plain and unambiguous meaning by referring to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Bautista v. Star Cruises*, 396 F.3d 1289, 1295 (11th Cir. 2005) (quotation omitted).

The plain and unambiguous language of subsection 8(b) of the NVRA leads to the following interpretation: a State may not consider failure to vote as a criterion for its voter removal program, because doing so "result[s] in" the removal of voters "by reason of" their failure to vote, in violation of the NVRA's Failure-to-Vote Prohibition. There is one exception to this rule, which is clarified by the HAVA amendment's Except-That Clause: a State voter-removal program may consider failure to vote if it removes a voter using the USPS Safe Harbor Procedure in subsection 8(c) ***and*** the Address-Confirmation Procedure in subsection 8(d).

Georgia's Section 234 voter-removal program violates this statutory scheme. It plainly considers failure to vote, and it thus "results in the removal" of voters by reason of their failure to vote, in

direct violation of the NVRA's Failure-to-Vote Prohibition. This interpretation of the NVRA and Section 234 is discussed in Sections I.A–B below.

And Section 234 is not saved by HAVA's Except-That Clause, for at least two reasons: because HAVA states that its amendment does not limit the scope of the NVRA, and because Section 234 does not use *both* the USPS Safe Harbor Procedure in subsection 8(c) *and* the Address-Confirmation Procedure in subsection 8(d)—as required by HAVA's Except-That Clause. Instead, Section 234 uses *only* the Address-Confirmation Procedure in subsection 8(d). The conclusion that HAVA does not immunize Section 234 is discussed in Part II.

A. Section 234 "result[s] in the removal of" voters "by reason of [their] failure to vote," in violation of the NVRA's Failure-to-Vote Prohibition.

Section 234 violates the Failure-to-Vote Prohibition in NVRA subsection 8(b)(2). That subsection prohibits voter-removal programs that "result in the removal of" voters "by reason of [their] failure to vote." § 20507(b)(2). The ordinary meaning of the term "result" is "to proceed or arise as a consequence, effect, or conclusion." *Husted*, 838 F.3d at 710 (quotation marks and citation omitted). Subsection 8(b)(2)

thus prohibits State programs under which a voter's removal proceeds as a consequence of her failure to vote.[6]

Georgia's Section 234 is just such a program. In fact, it specifically and explicitly *targets* for removal voters who have failed to vote: the Secretary must initiate voter-removal proceedings against voters who have failed to vote in the previous three years. § 21-2-234(a)(2).

Indeed, shortly after Section 234's passage, the Department of Justice wrote a letter to the Georgia Attorney General expressing the DOJ's opinion that Section 234 is unlawful because it removes voters by reason of their failure to vote:

> [W]ith respect to the procedures . . . [in Section 234] for removing registered voters from the registration list [that] provide for sending a registration confirmation notice to persons who have not voted or otherwise had "contact" during a three-year period . . . we note that the NVRA specifically provides with respect to such voter removal procedures that the procedures "shall not result in the removal of names of any person from the official list of voters

---

[6] This straightforward reading of the Failure-to-Vote Prohibition is bolstered by the legislative history. That history explains that the restrictions in subsection 8(b) (including the Failure-to-Vote Prohibition) apply to any voter-removal program "that is used to start, or has the effect of starting, a purge of the voter rolls, without regard to how [the program] is described or whether it may also have some other purpose." H.R. REP. NO. 103-9, at 15 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105, 119 (1993); *see also* S. REP. NO. 103-6, at 31 (same).

registered to vote in an election for federal office by reason of the person's failure to vote."

Under the proposed procedures, ***registered voters in Georgia who fail to vote (or otherwise have 'contact' with the election administration system) during a three-year period would be specifically targeted to be included in the state's purge procedures. This result is directly contrary to the language and purpose of the NVRA*** . . . .

**(Doc. 1 ¶ 27 & Doc. 1-1 at 1-2)** (emphasis added). That analysis has not changed.

In response to the straightforward conclusion that Section 234 "result[s] in" the removal of voters "by reason of their failure to vote," the Secretary first argues that Section 234 does not remove voters who fail to vote; it removes voters who make "no contact." By using the term "no contact," the Secretary points out, Section 234 results in the removal of a narrower class of nonvoters: those who have failed to vote *and* failed to do several other things, like sign a petition, update their voter registration card, etc. *See, e.g.*, **(Doc. 10-1 at 12)**; *see also supra* note 3.

The District Court was right to call this argument "disingenuous." **(Doc. 34 at 12)**. Removing only a portion of nonvoters—by including "other, extraneous" criteria, **(Doc. 34 at 12)**—still results in the

removal of nonvoters; it just results in something less than the removal

of *every* nonvoter. **(Doc. 34 at 12)**; *see also Husted*, 838 F.3d at 711. But

the NVRA does not prohibit only the removal of *every* nonvoter; it

prohibits the removal of *any* nonvoter: its Failure-to-Vote Prohibition

outlaws voter-removal programs that "result in the removal of the name

of *any person* . . . by reason of *the person's* failure to vote." § 20507(b)(2)

(emphasis added). The Supreme Court has interpreted similar language

in Title VII—which prohibits discrimination against "*any* individual"—

as protecting "the individual employee, rather than . . . the minority

group as a whole." *Connecticut v. Teal*, 457 U.S. 440, 453 (1982)

(quoting 42 U.S.C. § 2000e-2(a)(1), (b), (c)). Said simply, "any" means

any—whether in Title VII or the NVRA.

In essence, the Secretary argues that Section 234 is lawful

because it removes only a subset of the protected class of nonvoters—

those who have also failed to do other things, like sign a petition. But in

other contexts, both the Supreme Court and this court have rejected the

argument that a practice is permissible if it burdens only a subset of a

protected class rather than every member of the class. *See, e.g., Phillips*

*v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (Title VII prohibits

refusing to hire only the subset of women who have preschool-aged children); *Donaire v. NME Hosp., Inc.*, 27 F.3d 507, 509 (11th Cir. 1994) (42 U.S.C. § 1981 prohibits discrimination against Filipinos).[7]

The same is true here: removing only *some* nonvoters is no more compliant with the NVRA than removing *every* nonvoter. The Sixth Circuit colorfully explained the illogic of this argument, which the Ohio Secretary of State also made in defense of that State's voter-removal program. The Sixth Circuit wrote that a voter-removal program "triggered by a registrant's failure either to vote *or* to climb Mt. Everest *or* to hit a hole-in-one" still results in the removal of voters by reason of their failure to vote, and therefore still violates the NVRA. *Husted*, 838 F.3d at 711.

B. The District Court's contrary interpretation ignores both the NVRA's express language and its structure.

The Sixth Circuit's analysis is consistent with the statutory language; the District's Court's contrary analysis is not. After finding that Section 234 undeniably targets people for removal based on their

---

[7] *See also, e.g.*, *Brown v. Henderson*, 257 F.3d 246, 252–53 (2d Cir. 2001) ("[W]hether an employer discriminates against only a subset of a protected class, . . . Title VII nevertheless protects any individual so long as that individual is mistreated because of her [membership in a protected class]." (citation omitted)).

failure to vote (and that the State's contrary argument was "disingenuous," **(Doc. 34 at 10)**), the District Court nonetheless found that Section 234 did not violate the NVRA, despite the NVRA's prohibition on removal for failing to vote. **(Doc. 34 at 12–13)**.

To reach this conclusion, the District Court reasoned that the NVRA was "silent" about what criteria could "trigger" the Address-Confirmation Procedure in subsection 8(d). **(Doc. 34 at 13)**. Thus, the District Court concluded, the State was free to use any criteria for its voter-removal program so long as it used the Address-Confirmation Procedure in subsection 8(d) before removing a voter. **(Doc. 34 at 13–14)**. This conclusion ignores entire sections of the statute.

First, far from being "silent," the NVRA says exactly what type of program ***must be used*** in conjunction with the Address-Confirmation Procedure in subsection 8(d). Subsection (a)(4)(B) states that, to remove a voter because he or she has changed residence, States must comply with subsections "(b), (c) ***and*** (d)." § 20507(a)(4)(B) (emphasis added). These three subsections combine to form a set of protections to prevent improper removal of eligible voters, and this set of protections expressly includes the Failure-to-Vote Prohibition of subsection (b)(2). Based on

the word "and," any removal of voters must comply with all three subsections. The District Court ignored this directive and essentially transformed subsection 8(d) into its own safe harbor: the court ruled that a State voter-removal program is lawful if it complies with subsection 8(d) and subsection 8(d) alone.

Second, subsection (c) also undermines the District Court's conclusion that subsection (d) is a safe harbor unto itself. Subsection (c) states on its face that it is a permissive safe harbor—one way States "may" comply with subsection (a)(4)'s requirement to make a reasonable effort to remove voters who have changed addresses. Subsection 8(c) demonstrates how Congress creates a permissive safe harbor when it wants to. Had Congress intended the subsection (d) Address-Confirmation Procedure to be a safe harbor like subsection (c), it would have said so.

Instead, Congress did the opposite: unlike subsection (c), the NVRA never states that compliance with subsection (d)'s Address-Confirmation Procedure guarantees compliance with the requirements of subsection (a)(4). To the contrary, subsection (d) is written as an additional restriction on voter removal, which expressly prohibits a

State from removing a voter based on change of address without complying. It says: "A state shall not . . . ." It does not say that a State's compliance renders the voter-removal program lawful.

Thus, there is no basis for transforming subsection (d) into a standalone safe harbor, and it must be read as an additional restriction on any voter removal program based on change of address. States must meet this requirement in addition to the others contained in § 20507—including the Failure-to-Vote Prohibition.

Ultimately, the District Court's conclusion renders the Failure-to-Vote Prohibition meaningless. If a State can use failure to vote to "trigger" a voter-removal program—which will necessarily "result in" removal of voters by reason of their failure to vote—so long as the State complies with subsection (d), then subsection (b)(2)'s Failure-to-Vote Prohibition has been eliminated. This would allow voter-removal programs to be initiated based on the one reason that the statute says is expressly impermissible. This turns the statute on its head.[8]

---

[8] At a minimum, the statute cannot possibly be read to **unambiguously** have subsection (d) eliminate the other requirements for voter removal programs. *See, e.g., Yates v. United States*, 135 S. Ct. 1074, 1081–82 (2015) ("Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words.

## II. HAVA does not render Section 234 lawful.

In addition to the provisions above, both the District Court's conclusion and the Secretary's arguments misconstrue the "Except-That Clause" and other provisions of HAVA. The Secretary has repeatedly argued that, even if Section 234 does result in the removal of voters by reason of their failure to vote, it is authorized by HAVA's Except-That Clause. This is wrong.

### A. HAVA does not authorize any voter-removal program that would have been unlawful under the pre-HAVA NVRA.

As a general matter, HAVA did not narrow the scope of the NVRA. HAVA itself makes this clear: "[N]othing in [HAVA] may be construed to authorize . . . conduct prohibited under . . . , or to supersede, restrict, or limit the application of . . . (4) The National Voter Registration Act of 1993." 52 U.S.C. § 21145(a) (citation omitted); *see also, e.g., id.*

---

Rather, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole.") (internal citations and punctuation omitted).

In that context, the legislative history makes clear that the District Court's conclusion violates Congress's intent. *See* H.R. Rep. No. 103-9, at 18 (noting that "an underlying purpose of the Act [is] that once registered, a voter should remain on the list of voters so long as the individual remains eligible to vote in that jurisdiction"); *see also supra* note 2 (discussing Senate report).

§ 21083(a)(2)(A)(i) (voters "shall be removed in accordance with the provisions of the [NVRA]").

This statutory language undermines any argument that HAVA's amendment could authorize a voter-removal program that would have been illegal under the pre-amendment NVRA. And this is exactly the Secretary's argument.

B. In any event, Section 234 does not comply with HAVA's Except-That Clause.

Even ignoring this problem with the Secretary's HAVA argument, his specific reasoning fails. The Secretary argues that Section 234 is lawful under the HAVA's Except-That Clause. As mentioned, HAVA appended the clause to subsection 8(b)(2) of the NVRA. *See* Pub. L. No. 107-252, § 903, 116 Stat. 1666, 1728. The clause reads:

> except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—
> (A) has not . . . responded . . . to [an address-confirmation notice]; and then
> (B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

The Secretary insists that this clause renders Section 234 legal.

He says that this Except-That Clause expressly permits Section 234 to use only the Address-Confirmation Procedure in subsection 8(d). In the

District Court, the Secretary wrote: "The 2002 [HAVA] amendment to the NVRA expressly allows states to remove from their registration lists those voters who (1) fail to respond to the statutory notice . . . and (2) fail to vote in two additional federal elections." **(Doc. 10-1 at 11)**.

This simply repeats the flawed analysis that transforms subsection 8(d)'s Address-Confirmation Procedure into a standalone safe harbor. But more fundamentally, this argument completely ignores the Except-That Clause's actual language. To exempt a voter-removal program from the Failure-to-Vote Prohibition, the Except-That Clause's language requires States to use *both* the USPS Safe Harbor Procedure in subsection 8(c) *and* the Address-Confirmation Procedure in subsection 8(d): "except that nothing in this paragraph may be construed to prohibit a State from *using the procedures described in subsections [8](c) **and** (d) to remove an individual* from the official list of eligible voters." § 20507(b)(2) (emphasis added).

The Secretary treats the word "and" as if it were "or." The use of the conjunctive "and" is crucial: HAVA's Except-That Clause immunizes State voter-removal programs that use *both* the USPS Safe Harbor (in subsection 8(c)) "*and*" the Confirmation Procedure (in subsection 8(d)).

*See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 117 (2012) ("A common interpretive issue involves the conjunction *and*, which (if there are two elements in the construction) entails an express or implied *both* before the first element.").

When Georgia removes a voter under Section 234, it does not use *both* the USPS Safe Harbor Procedure "*and*" the Address-Confirmation Procedure, as required; it uses *only* the Address-Confirmation Procedure.[9]

As if there were any doubt on this point, Section 234 is explicit about not using the USPS Safe Harbor Procedure. By its terms it applies only to voters who have not already been removed under the USPS Safe Harbor Procedure. The text of Section 234 requires the Secretary to initiate voter-removal proceedings against nonvoters, but only those nonvoters who "were not identified as changing addresses under Code Section 21-2-233," Georgia's codification of the USPS Safe-Harbor Procedure. § 21-2-234(a)(2).

---

[9] Of course, Georgia already has another voter-removal program—Section 233—that does use *both* the USPS Safe Harbor *and* the Confirmation Procedure. But Section 234, the voter-removal program challenged here, uses only the latter.

In sum, even if HAVA's Except-That Clause could make Section 234 lawful, Section 234 does not satisfy the requirements of the clause.

C. <u>HAVA's Except-That Clause merely clarified an arguable inconsistency between the Failure-to-Vote Prohibition and the Address-Confirmation Procedure.</u>

One might wonder: what exactly does HAVA's Except-That Clause do? If HAVA specifically states that it did not narrow the scope of the NVRA, is the Except-That Clause mere surplusage? It's not. The most natural reading is that HAVA appended the Except-That Clause to subsection 8(b)(2) to clarify an arguable internal inconsistency in the NVRA.

Before HAVA, some tension existed between subsection 8(b)(2)'s Failure-to-Vote Prohibition—which prohibits removing voters for failure to vote—and subsection 8(d)'s Address-Confirmation Procedure—which prohibits removing voters until they have failed to vote for two elections. After all, one might have argued that a State cannot comply with both directives—to never remove voters for failure to vote (the Failure-to-Vote Prohibition), but also to remove voters only after they have failed to vote for two elections (the Address-Confirmation Procedure).

HAVA's Except-That Clause clarified this internal inconsistency. It did so by confirming that the Failure-to-Vote Prohibition does not prevent States from considering failure to vote *when they use* the USPS Safe Harbor Procedure **and** the Address-Confirmation Procedure. This is clear from the text of the clause, which specifically refers to the subsections containing both the USPS Safe Harbor Procedure and the Address-Confirmation Procedure: "except that nothing in this paragraph may be construed to prohibit a State from using the *procedures described in subsections [8](c) and (d) . . . .*" § 20507(b)(2). Subsections 8(c) and (d) are, of course, the USPS Safe Harbor and the Confirmation Procedure.

This reading is confirmed by the other provisions of HAVA stating that it does not authorize any conduct prohibited by the NVRA. *See, e.g.*, § 21145(a); *see also supra* section II.A, at 30–31. It is also supported by the title of HAVA § 903, which appended the Except-That Clause to subsection 8(b)(2) of the NVRA. The section is titled "***Clarification*** of ability of election officials to remove registrants from official list of voters on ground of change of residence." Pub. L. No. 107-252, § 903, 116 Stat. at 1728 (emphasis added); *see also* SCALIA & GARNER at 221

(headings and titles are "tools available for the resolution of a doubt"

(quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519,

528–29 (1947)). Thus, the Except-That Clause merely "clarif[ies]" this

arguable inconsistency in the NVRA.

The best reading of subsection 8(b)(2), as amended by HAVA, is

this: States cannot consider failure to vote in removing voters, because

doing so "result[s] in" the removal of voters "by reason of their failure to

vote." The one and only time States may consider failure to vote is when

they remove a voter using the USPS Safe Harbor Procedure *and* the

Address-Confirmation Procedure. This is precisely what the statute

says; and Section 234 violates this statutory scheme.

## III. The District Court erred by dismissing Plaintiffs' First Amendment Claim, particularly on a motion to dismiss with a bare record.

Finally, the District Court erred by dismissing Plaintiffs' First

Amendment claim. **(Doc. 1 ¶¶ 41–42)**; **(Doc. 34 at 16–21)**. The District

Court erred because it applied the wrong standard of First Amendment

scrutiny, and because Plaintiffs' First Amendment claim can be

resolved only based on factual determinations, not on the bare record of

a motion to dismiss.

A. <u>The right not to vote is protected by the First Amendment.</u>

No one disputes that the right to vote is a fundamental right guaranteed by the Constitution. *See, e.g.*, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which . . . we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.").

And the primary purpose of the "First Amendment was . . . [to] protect a democratic system whose proper functioning is indispensably dependent on the unfettered judgment of each citizen on matters of political concern." *Elrod*, 427 U.S. at 372. Voting choices are the most direct manner in which citizens use and express their "judgment . . . on matters of political concern." *Id.* Protecting each citizen's ability to freely make such judgments without fear of retaliation or penalty is at the core of the First Amendment's role. *See id.* at 356.

Casting a vote is undeniably expressive: voters are expressing their belief that their chosen candidate is the best for the job. For this reason, even a vote for a "non-existent or fictional person" is protected. *Dixon v. Md. State Admin. Bd. of Election Laws*, 878 F.2d 776, 782 (4th

Cir. 1989). By casting a vote for Mickey Mouse, or the Tooth Fairy, or Francis Underwood, a voter can express any number of things: her dislike of the candidates; her opinion that all the candidates are the same; her belief that her vote is insignificant; or her suspicion that the election itself is futile, improper, or "rigged" in one way or another.

If the Constitution protects the right *to vote*, even for a fictional person, then it also protects the right *not to vote*. *See* S. REP. NO. 103-6, at 17 (1993) ("[W]hile voting is a right, people have an equal right not to vote, for whatever reason."). A voter who chooses not to vote may do so for the same expressive reasons as the voter who votes for Mickey Mouse. First among those reasons is a voter's displeasure with the available options: by not voting, she says she cannot abide any of the candidates. As the plaintiffs in *Hoffman v. Maryland*, 928 F.2d 646 (4th Cir. 1991), put it:

> they want to be recorded as parties who are registered to vote but did not cast a ballot. This action of being registered but not voting, they claim, expresses their discontent with the candidates because the State announces the number of voters registered to vote but who did not. The argument goes that such announcement indicates their dissatisfaction and implicates the right to free speech.

*Id.* at 648. This is core political expression.

## B. The District Court applied the wrong level of First Amendment scrutiny.

The District Court applied the wrong legal standard when it held that Section 234 is a reasonable time, place, or manner restriction subject to rational basis review. **(Doc 34 at 17)**. In fact, under the First Amendment, laws that restrict or burden the content of protected speech are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015); *see also, e.g.*, *United States v. Alvarez,* 132 S. Ct. 2537, 2543–44 (2013).

Contrary to the District court's conclusion, Section 234 is just such a law. It treats voters differently based on *whether or how* they exercise their First Amendment right to vote or not to vote. Voters who choose, for whatever reason, not to vote are burdened by Section 234. They are required to respond to address-confirmation notices from the Secretary and are at risk of being removed from the rolls, even though the Secretary has no reason to believe they are ineligible. People who make the opposite choice—to vote—are not similarly burdened, nor are they at risk of being purged from the rolls.

The removal of a citizen's name from the rolls based on her failure to vote uniquely undermines the content of her expression. Indeed, if a voter chooses not to vote in order to express her dislike of all the candidates, her refusal to vote lacks force unless she is registered. For example, as noted above, the "action of being registered but not voting . . . expresses . . . discontent with the candidates because the State announces the number of voters registered to vote but who did not." *Hoffman*, 928 F.2d at 648.[10]

At a minimum, the rights and conduct regulated by Section 234 are subject to the speech/non-speech test articulated in *United States v. O'Brien*, 391 U.S. 367 (1968), because the section regulates both speech and non-speech conduct: the expressive aspect of voting and the nonspeech aspect of remaining a registered voter under state law.

A regulation is permissible under the *O'Brien* test if: (1) it "is within the constitutional power of the government"; (2) "it furthers an important or substantial government interest"; (3) "the government interest is unrelated to the suppression of free expression"; and (4) it "is

---

[10] The Secretary announces these numbers for Georgia elections. In the 2016 general election, 5,443,046 voters were registered but only 4,165,405 votes were cast. http://results.enr.clarityelections.com/GA/63991/184321/en/summary.html (last visited June 5, 2017).

no greater than is essential to the furtherance of that interest." *Curves, LLC v. Spalding Cty.,* 685 F.3d 1284, 1289 (11th Cir. 2012).

C. The District Court erred by holding, on the basis of a bare record, that Section 234 is constitutionally permissible.

In any event and under any standard, Section 234 cannot pass constitutional muster on the current record. Section 234 fails the second and fourth elements of the *O'Brien* test because (a) there is no evidence whatsoever that it furthers a substantial interest; and (b) it regulates far more speech than is necessary. And Section 234 would fail even rational basis review for the same reason: there is simply no evidence that it is necessary or reasonable in any way.

Indeed, the District Court assumed that maintaining an accurate voter list is a "substantial governmental interest," **(Doc. 34 at 19)**, but it reached no conclusion and cited no evidence for the proposition that Section 234 furthers that interest. In fact, there is nothing facially inaccurate about a voter-registration list containing lawfully registered, eligible voters who have made not voted in three years.

And *Section 233*—which removes voters based on the USPS Safe-Harbor Procedure—already removes voters who have changed addresses, and complies with the NVRA. And it does so in a more

reliable and tailored way. Section 233 is an extant, readily available statutory alternative that does not burden expression based on failure to vote. And it furthers the exact same (alleged) interest: removing voters who have changed addresses and maintaining accurate voter lists. Section 233 thus remedies the same alleged harm in a less restrictive and more accurate way. There is no evidence that Section 234 is required or reasonable. And, as evidenced by the narrower Section 233, Section 234 undeniably burdens substantially more speech than necessary. It thus violates the First Amendment.[11]

The District Court's contrary conclusion is based on an evidence-free record with no facts at all. Although the District Court purported to follow *Hoffman*, *Hoffman* was not decided on a motion to dismiss. The district court in that case concluded that Maryland's voter-removal program was constitutional based on specific findings of fact: the district court held there was no Constitutional violation "on the basis of

---

[11] Assuming the (unstated) governmental interest is the removal of voters who have changed addresses, Section 234 is both overbroad and underbroad. It is overbroad because it removes voters who have not voted for three years, but there are many reasons a voter may choose not to vote: apathy, dislike of the candidates or the voting system, disability, sickness, etc. And Section 234 is underbroad too. It fails, for example, to remove voters who have in fact changed addresses but return to vote in their old jurisdiction.

a documentary and stipulated record" that included "stipulated facts and facts offered in declarations." Brief of Appellants at 4, *Hoffman v. Maryland*, 928 F.2d 646 (4th Cir. 1991) (No. 90-2665), 1990 WL 10546430; *see also Hoffman*, 928 F.2d at 647 ("the district court *found* that the statute did not 'offend the constitutional rights of plaintiffs to vote, or not to vote . . . .'" (emphasis added) (quoting *Hoffman v. Maryland*, 736 F. Supp. 83, 89 (D. Md. 1990)).

No such evidence exists in this case. The Secretary moved to dismiss in lieu of answering, and under local rule discovery has not even begun. *See* LR 26.2(A), NDGa (discovery begins after answer).

The record contains no facts about the State's purposes in enacting and enforcing Section 234; about whether the State's purposes (if any) are genuine or pretextual; about how Section 234 impacts Plaintiffs' ability to reregister voters who have been removed; about the severity of Georgia's reregistration burden; or about anything else.

Yet instead of deferring decision and waiting until the record contained *any* facts, the District Court simply made fact findings of its own. It wrote: "the Court finds that maintenance of accurate voter registration rolls is a substantial governmental interest." **(Doc. 34 at**

**19)**; *see also, e.g.*, **(Doc. 34 at 20)** (holding that "the Georgia statute is reasonable and nondiscriminatory"). This is impermissible. Put simply, it is error to decide a fact-intensive claim on a motion to dismiss, without an evidentiary record, and on the basis of court-made fact findings.

Not a single case cited by either the Secretary or the District Court resolved a First Amendment challenge on a motion to dismiss or on the basis of a fact-free record:

- *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 673 (2010) (summary judgment);

- *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1049 (10th Cir. 2007) (denying a preliminary injunction "[a]fter finding that the facts regarding the city's policy (or lack thereof) were in dispute"), *reversed*, 555 U.S. 460 (2010);

- *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 355 (1997) (summary judgment);

- *Burdick v. Takushi*, 937 F.2d 415, 417 (9th Cir. 1991), *aff'd*, 504 U.S. 428 (1992) (preliminary injunction);

- *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 45 (1986) (summary judgment);

- *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 796 (1985) (summary judgment);

- *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 292 (1984) (summary judgment);

- *Rosario v. Rockefeller*, 410 U.S. 752, 756, 760 (1973) (denying declaratory relief where a restriction on voter registration was "not an arbitrary time limit unconnected to any important state goal");

- *United States v. O'Brien*, 391 U.S. 367, 369 (1968) (affirming a criminal conviction entered after the defendant "was indicted, tried, convicted, and sentenced");

- *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 690 (11th Cir. 2014) (cross-motions for summary judgment);

- *Keeton v. Anderson-Wiley*, 664 F.3d 865, 867–68 (11th Cir. 2011) (denying a motion for preliminary injunction based on a verified complaint and after holding an evidentiary hearing).

And other cases considering challenges to voting laws also make the relevant determinations only after considering record evidence. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 783 (1983) (granting summary judgment, where "the State did not advance any administrative reasons for the early deadline," and after "reject[ing] the State's asserted justification"); *Burns v. Fortson*, 410 U.S. 686, 686 (1973) (affirming that Georgia's 50-day cutoff for registration was constitutional, where the "State offered extensive evidence to establish the need for" the cutoff, and "Plaintiffs introduced no evidence").

This is for good reason. As some of these same cases recognize, First Amendment challenges turn on facts:

> Decision in this context, as in others, is very much a matter of degree, very much a matter of considering the facts and

circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.

*Storer v. Brown*, 415 U.S. 724, 730 (1974) (citations omitted) (alterations adopted).

Under any standard, the District Court simply failed to conduct the proper inquiry when it dismissed the First Amendment claim. This Court should reverse.

## CONCLUSION

Georgia's Section 234 voter-removal procedure specifically and explicitly targets for removal registered voters based on their failure to vote. Protecting voters' right not to vote was one of the primary concerns that animated Congress's passage of the NVRA. By holding that Section 234 does not violate the NVRA, the District Court turned that statute on its head; ignored its plain text; and broke with the decision of the only Court of Appeals to consider this question. The District Court's judgment should be reversed.

Respectfully submitted this 5th day of June, 2017.

> */s/ Emmet J. Bondurant*
> Emmet J. Bondurant
> Georgia Bar No. 066900
> Jason J. Carter
> Georgia Bar No. 141669
> Chad K. Lennon
> Georgia Bar No. 408953
>
> **BONDURANT MIXSON & ELMORE LLP**
> 3900 One Atlantic Center
> 1201 West Peachtree Street NW
> Atlanta, Georgia  30309
> Telephone: (404) 881-4100
> Facsimile: (404) 881-4111
>
> *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of FED.
R. APP. P. 32(a)(7)(B) because, excluding the parts of the document
exempted by FED. R. APP. P. 32(f) and 11th Cir. R. 32-4, this document
contains 9279 words.

2.     This document complies with the typeface requirements of
FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP.
P. 32(a)(6) because this document has been prepared in a proportionally
spaced typeface using Microsoft Word 2016 (Version 16.0.78310.1018) in
14-point Century Schoolbook.

*/s/ Chad K. Lennon*  
Chad K. Lennon

**CERTIFICATE OF SERVICE**

I certify that on June 5, 2017, I filed this document using the Court's CM/ECF system, which will automatically email the document to the following counsel of record:

Christopher M. Carr
Annette M. Cowart
Russell D. Willard
Julia B. Anderson
Cristina M. Correia (ccorreia@law.ga.gov)
Josiah B. Heidt (jheidt@law.ga.gov)

40 Capital Square SW
Atlanta, Georgia  30334-1330
Telephone: (404) 656-7063
Facsimile: (404) 651-9325

/s/ Chad K. Lennon
Chad K. Lennon