No. 17-11315

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

COMMON CAUSE, ET AL.,
Plaintiffs-Appellants,

v.

BRIAN KEMP, Georgia Secretary of State,
Defendant-Appellee.
_____

On Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
No. 1:16-cv-00452-TCB
_____

CORRECTED BRIEF OF *AMICI CURIAE* AMERICAN CIVIL
LIBERTIES UNION FOUNDATION, AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF GEORGIA, AND DĒMOS, IN SUPPORT OF
APPELLANTS AND REVERSAL
_____

Sophia Lin Lakin
Dale E. Ho
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION, INC.
125 Broad Street
New York, NY 10004
(212) 519-7836

Sean J. Young
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF GEORGIA, INC.
PO Box 77208
Atlanta, GA 33057
(678) 981-5295

Stuart C. Naifeh
Naila S. Awan
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 633-1405

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, *amici* the American Civil Liberties Union Foundation, the American Civil Liberties Union Foundation of Georgia, Inc., and Dēmos (collectively, "*Amici Curiae*") certify that they are private non-profit organizations, that they are not publicly held entities, and that they have no parent corporations. No publicly held corporation or other publicly held entity owns ten percent (10%) or more of any *amicus* organization. *Amici Curiae* further certify that, in addition to the persons and entities identified in the brief of Plaintiffs-Appellants Common Cause and the Georgia State Conference of the NAACP filed on June 5, 2017, the following persons may have interest in the outcome of this case:

American Civil Liberties Union Foundation, Inc. (*amicus curiae*)

American Civil Liberties Union Foundation of Georgia, Inc. (*amicus curiae*)

Awan, Naila S. (*counsel for amici curiae*)

Dēmos: A Network for Ideas and Action, Ltd. (*amicus curiae*)

Ho, Dale E. (*counsel for amici curiae*)

Lakin, Sophia Lin (*counsel for amici curiae*)

Naifeh, Stuart C. (*counsel for amici curiae*)

Young, Sean J. (*counsel for amici curiae*)

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), *Amici Curiae* further certify that no party's counsel authored the brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than *Amici Curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief.

*s/  Sophia Lin Lakin*

Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION, INC.
125 Broad Street
New York, NY 10004
(212) 519-7836
slakin@aclu.org

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF CITATIONS ........................................................................ iv

INTEREST OF *AMICI CURIAE* ...........................................................1

STATEMENT OF ISSUES .....................................................................4

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................5

ARGUMENT ........................................................................................9

I.      THE DISTRICT COURT ERRED IN CONCLUDING THAT SECTION 234 DOES NOT VIOLATE THE NVRA ..................................10

      A.      The Plain Language of the NVRA Expressly Prohibits Georgia from Targeting Voters for Removal from the Registration Rolls "by Reason of" Their Failure to Vote." .............................................10

      B.      Georgia's Use of Failure to Vote to Initiate Removal Procedures Does Not Constitute a "Reasonable Effort" to Identify Voters Who Have Become Ineligible by Reason of a Change in Address, as Required by the NVRA. ...................................................................18

II.     GEORGIA'S PRACTICE OF REMOVING INFREQUENT VOTERS FROM THE REGISTRATION ROLLS DAMAGES DEMOCRATIC PARTICIPATION. ............................................................................22

CONCLUSION ....................................................................................26

CERTIFICATE OF COMPLIANCE .........................................................28

CERTIFICATE OF SERVICE .................................................................29

# TABLE OF CITATIONS

## Cases

*A. Philip Randolph Institute v. Husted*,
838 F.3d 699 (6th Cir. 2016) ..................................................................... *passim*

*American Civil Rights Union v. Philadelphia City Commissioners*,
Civ. A. No. 16-1507, 2016 WL 4721118 (E.D. Pa., Sept. 9, 2016).....................3

*American Civil Rights Union v. Snipes*,
No. 16-CV-61474-BB (S.D. Fla.)...........................................................................2

*Charles H. Wesley Education Foundation, Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) ............................................................................2

*Commissioner of Internal Revenue v. Clark*,
489 U.S. 726 (1989)..........................................................................................17

*Crandon v. United States*,
494 U.S. 152 (1990).................................................................................... 10, 19

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) .............................................................................2

*Gozlon-Peretz v. United States*,
498 U.S. 395 (1991)..........................................................................................19

*Keene Corp. v. United States*,
508 U.S. 200 (1993)..........................................................................................17

*Ohio A. Philip Randolph Institute v. Husted*,
No. 16-CV-303, 2016 WL 3542450 (S.D. Ohio, June 29, 2016)..........................2

*United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011)..........................................................................................16

*United States v. Missouri*,
No. 05-4391-CV-C-NKL, 2007 WL 1115204 (W.D. Mo. Apr. 13, 2007).........19

*Voter Integrity Project v. Wake County Board of Elections*,
   No. 16-CV-683-BR (E.D.N.C.) ............................................................2

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) .........................................................................26

**Statutes**

52 U.S.C. § 20501 ................................................... 5, 9, 11, 24

52 U.S.C. § 20507 .................................................... *passim*

52 U.S.C. § 21145 ...............................................................15

Ga. Code § 21-2-2 ...............................................................7

Ga. Code § 21-2-232 ...........................................................6

Ga. Code § 21-2-233 ...........................................................6

Ga. Code § 21-2-234 ..........................................................6, 7

Ga. Code § 21-2-235 ...........................................................7

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) .................................19

Kristine Cordier Karnezis, *Construction and Application of Provisional
   Balloting Provisions of the Help America Vote Act*, 10 A.L.R. Fed. 2d 653
   (2006)..........................................................................13

Michael P. McDonald, *2016 November General Election Turnout Rates*,
   United States Election Project, http://www.electproject.org/2016g.....................8

Press Release, U.S. Census Bureau, Americans Moving at Historically Low
   Rates, Census Bureau Reports (Nov. 16, 2016), *available at*
   https://www.census.gov/newsroom/press-releases/2016/cb16-189.html............22

Press Release, U.S. Census Bureau, U.S. Mover Rate Remains Stable at
  About 12 Percent Since 2008, Census Bureau Reports (Mar. 18, 2015),
  *available at* https://www.census.gov/newsroom/ press-releases/2015/cb15-
  47.html ..............................................................................................................22

The National Voter Registration Act of 1993 (NVRA) *Questions and Answers*
  ¶ 34, Dep't of Justice (Sept. 1, 2016), https://www.justice.gov/crt/national-
  voter-registration-act-1993-nvra................................................................. 20, 21

**Rules**

Fed. R. App. P. 29 .....................................................................................................3

**Legislation**

Pub. L. No. 107-252 (2002) ....................................................................................15

**Legislative Reports**

H.R. Rep. No. 103-9 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105............ *passim*

H.R. Rep. No. 107-730 (2002)................................................................................15

S. Rep. No. 103-6 (1993) ............................................................................... *passim*

**INTEREST OF *AMICI CURIAE***

The American Civil Liberties Union Foundation ("ACLU") is a nationwide, non-partisan organization of approximately 1.6 million members, nearly 300 staff attorneys, thousands of volunteer attorneys, and offices throughout the nation. The ACLU is dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. Since 1965, the ACLU, through its Voting Rights Project, has litigated more than 300 voting rights cases. These include several voting rights cases before this Court in which the ACLU served as party's counsel or as an *amicus*.

The American Civil Liberties Union Foundation of Georgia, Inc. ("ACLU Georgia") is the Georgia affiliate of the ACLU. Having more than 20,000 members in Georgia, ACLU Georgia appears routinely in state and federal courts both as *amicus* and direct counsel to protect and to defend—without bias or political partisanship—the right to vote.

Dēmos is a public policy organization working for an America where we all have an equal say in our democracy and an equal chance in our economy. The goals of removing barriers to political participation and ensuring full representation of America's diverse citizenry are central to Dēmos' mission. Dēmos deploys original research, advocacy, litigation, and strategic communications to protect voting rights and ensure that the voices of all citizens can be heard.

*Amici Curiae* have a significant interest in the outcome of this case and in other cases across the country involving state laws and practices that result in the erroneous removal of eligible voters from a state's voter rolls and that place onerous barriers on voter registration. Such laws and practices disenfranchise and disillusion eligible voters, and simultaneously place additional burdens on election administrators. Dēmos, the ACLU, and the ACLU's Ohio affiliate are currently counsel to plaintiffs in *Ohio A. Philip Randolph Institute v. Husted*, No. 16-CV-303, 2016 WL 3542450 (S.D. Ohio, June 29, 2016), *rev'd*, 838 F.3d 699 (6th Cir. 2016), *cert granted*, *Husted v. APRI*, No. 16-980, 2017 WL 515274 (May 30, 2017), a case under the National Voter Registration Act of 1993 ("NVRA") challenging an Ohio roll-maintenance practice analogous to the one at issue here, namely, the use of a person's failure to vote as the trigger to initiate a purge process. *Amici Curiae* have also participated in other NVRA cases involving unnecessary and unlawful registration obstacles, *see, e.g.*, *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) (ACLU as counsel for plaintiffs); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) (ACLU as counsel for *amicus curiae*), and purge processes, *see, e.g.*, *Voter Integrity Project v. Wake Cty. Bd. of Elec.*, No. 16-CV-683-BR (E.D.N.C.) (Dēmos as counsel for Defendant-Intervenors); *Am. Civil Rights Union v. Snipes*, No. 16-CV-61474-BB (S.D. Fla.) (Dēmos as counsel for Defendant-Intervenors); *Am. Civil Rights Union v. Phila.*

*City Comm'rs*, Civ. A. No. 16-1507, 2016 WL 4721118 (E.D. Pa., Sept. 9, 2016),

*appeal docketed*, No. 16-3811 (3rd Cir. Oct. 12, 2016) (Dēmos as *amicus curiae*).

Accordingly, *Amici Curiae* submit this brief to urge reversal of the District

Court's determination that Georgia's use of a voter's failure to vote to initiate a

purge process does not violate the National Voter Registration Act of 1993 and

decision to dismiss Appellants' complaint.

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure,

*Amici* state that all parties have consented to the filing of this brief.

## STATEMENT OF ISSUES

The National Voter Registration Act of 1993 ("NVRA") governs the way States may remove voters from their voter rolls. Among other things, the NVRA requires States to adopt a program that makes a reasonable effort to remove ineligible voters from their rolls. 52 U.S.C. § 20507(a)(4). The NVRA subjects state voter-removal programs to an important restriction: the programs "shall not result in the removal" of any voter "by reason of the person's failure to vote." *Id.* § 20507(b)(2). One of Georgia's voter-removal programs, Ga. Code § 21-2-234, requires the Georgia Secretary of State to initiate voter-removal proceedings against voters who have not voted (or had other voting-related "contact" with election officials) for three years. Does this program violate the NVRA?

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

In enacting the National Voter Registration Act of 1993 ("NVRA"), Congress sought first and foremost to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). Congress also sought to "ensure that accurate and current voter registration rolls are maintained," *id.* § 20501(b)(4), but strictly limited the circumstances under which a voter can be removed from the rolls. In particular, while states must make a "reasonable effort" to remove voters who have become ineligible by reason of a change in address from the voter rolls, states are expressly prohibited from establishing procedures that "result in the removal of the name of any person from the official list of voters . . . by reason of the person's failure to vote." *Id.* § 20507(a)(4), (b)(2).

Animating this prohibition is the basic principle that just as every eligible voter has the constitutional right to vote, each voter also has the right *not* to cast a ballot—and the mere exercise of that right should not provide grounds for removing a voter from the voter rolls. Thus, the NVRA permits an individual's failure to vote to play a role in list maintenance in only one circumstance: As a component of a back-end procedure to *confirm* that a voter is no longer eligible to vote in a particular jurisdiction due to a change in residence, a procedure that may be used only *after* a state receives independent and reliable information indicating

that a voter may have moved. *See generally id.* § 20507(a)-(d); *see also A. Philip Randolph Institute (APRI) v. Husted*, 838 F.3d 699, 710-11 (6th Cir. 2016), *cert. granted*, *Husted v. APRI*, 16-980, 2017 WL 515274 (May 30, 2017).

Section 21-2-234 of the Georgia Election Code, Ga. Code § 21-2-234 ("Section 234"), completely disregards this limitation, using failure to vote as the *front end* impetus to *initiate* a process of removing a voter from the registration rolls. Based on the assumption that a mere failure to vote, in itself, signals that a voter has moved,[1] Section 234 requires the Secretary of State to begin a change-of-address confirmation process for any registered voter who has not voted and who has otherwise had "no contact"[2] with election officials in the "preceding three calendar years." Ga. Code § 21-2-234(a)(2). Under this process, the voter is sent a

---

[1] Georgia uses several other methods to remove voters from its rolls who have become—or who the state *suspects* have become—ineligible by reason of a change in address, none of which are at issue in the case at hand. *See* Ga. Code § 21-2-232(a) (voter removed from state's registration rolls upon voter's request); *id.* § 21-2-232(b) ("[A]n elector [who] moves to another county or state and registers to vote" will be removed from rolls if "the registration officials send a notice of cancellation reflecting the registration of the elector in the other county or state[.]"); *id.* § 21-2-233 (Secretary of State may use U.S. Postal Service's National Change of Address database to identify a voter who may have moved and initiate process to remove that voter from rolls).

[2] Georgia law defines "no contact" to "mean that the elector has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, and has not confirmed the elector's continuation at the same address during the preceding three calendar years." Ga. Code § 21-2-234(a)(1).

notice and will be removed from the registration rolls if the voter does not take any affirmative action in or prior to the second federal general election that takes place after the notice was sent. *Id.* § 21-2-234(a)(2), (b), (g).[3] Thus, Section 234 violates the NVRA because use of failure-to-vote to trigger a purge process (1) plainly results in a voter's removal from the rolls "by reason of the person's failure to vote" in violation of the NVRA's express prohibition; and (2) cannot qualify as a "reasonable effort" to identify voters who have become ineligible by reason of a change in residence, *see* 52 U.S.C. § 20507(a)(4), (b)(2), because a voter's failure to vote is simply *not* reliable evidence that the voter has moved.

Yet, while the District Court recognized that under Section 234 a voter's "failure to vote is necessary to trigger" the change-of-address purge process, Doc. 34 at 12, it still concluded that this removal process is somehow consistent with the NVRA's prohibition on list maintenance programs that purge eligible voters "by reason of [their] failure to vote." 52 U.S.C. § 20507(b)(2). This interpretation contradicts the plain language of the NVRA, disenfranchises voters, and imposes

---

[3] Under Georgia law, if a voter has been sent a notice by reason of their failure to vote and does not respond to that notice within 30 days, the voter will be placed on an inactive list. Ga. Code § 21-2-234(g). The voter will "remain on [the inactive] list until the day after the second November general election held after the elector is placed on the inactive list of electors." *Id.* § 21-2-235(b); *see also id.* § 21-2-2(15) (defining November election to mean a federal general election). If at that point in time the voter has not voted or otherwise had any contact with election officials, the voter is purged from the registration rolls. *Id.* § 21-2-235(b).

the precise re-registration burdens on eligible voters that the NVRA sought to avoid. Indeed, if implemented nationally, the Section 234 purge procedure would threaten millions of lawfully registered voters with removal from the rolls. With forty percent of qualified voters in the United States not casting a ballot in the 2016 General Election,[4] such list maintenance practices would serve only to further depress democratic participation.

The Sixth Circuit's decision in *APRI v. Husted*, 838 F.3d 699, exposes the errors in the District Court's analysis. In *APRI*, the Sixth Circuit addressed whether an Ohio roll-maintenance process that relies on failure to vote to trigger a change-of-address purge process violates the NVRA's prohibition on removal procedures that "result in the removal of the name of any person from the official list of voters . . . by reason of the person's failure to vote"—the identical question of statutory interpretation at issue here. *Id.* at 707-12 (analyzing whether Ohio's purge process violates 52 U.S.C. § 20507(b)(2)). Using traditional tools of statutory construction, the Sixth Circuit correctly concluded that the Ohio process violates the plain language of the NVRA because using failure to vote to trigger a removal process "constitutes perhaps the plainest possible example of a process that 'result[s] in'

---

[4] *See* Michael P. McDonald, *2016 November General Election Turnout Rates*, United States Election Project, http://www.electproject.org/2016g (last visited June 12, 2017).

removal of a voter from the rolls by reason of his or her failure to vote." *Id.* at 712. In doing so, the Sixth Circuit recognized the narrow and carefully circumscribed back-end confirmation role that failure to vote plays in the NVRA change-of-address removal process. *Id.* at 710-11; *see also* 52 U.S.C. § 20507(a)-(d).

This limited use of failure to vote is consistent with the NVRA's goals of "increas[ing] the number of eligible citizens who register to vote," 52 U.S.C. § 20501(b)(1), protecting the right of citizens to choose whether to vote, and not punishing voters who exercise their right not to cast a ballot in a particular election. *See, e.g.*, S. Rep. No. 103-6, at 17 (1993). As the documented experiences of voters in Ohio underlying the Sixth Circuit's decision amply illustrate, roll-maintenance processes like those created by Section 234 result in large numbers of eligible voters being erroneously removed from the registration rolls and subsequently denied their right to vote. *See infra* Part II.

Georgia voters will continue to be denied their fundamental right to vote and required to unnecessarily re-register under the District Court's erroneous interpretation of the NVRA. The District Court's decision should be reversed.

## ARGUMENT

Georgia's practice of removing voters from the rolls merely because they exercised their right not to cast a vote violates federal law and undermines the democratic system. By using a voter's failure to vote to initiate a cancellation

process, Section 234 of the Georgia Code runs counter to the NVRA's roll-maintenance provisions in two ways: (1) the law has led to Georgians being removed from the voter rolls "by reason of [their] failure to vote," and (2) use of failure to vote to initiate a cancellation process cannot possibly by characterized as a "reasonable effort" to remove voters from the rolls who have become ineligible by reason of a change in residence. Further, because a voter's mere failure to vote cannot alone serve as a reliable indicator that a voter has moved, Section 234 has and will continue to remove eligible Georgian voters from the registration rolls and deny them their fundamental right to vote.

## I. THE DISTRICT COURT ERRED IN CONCLUDING THAT SECTION 234 DOES NOT VIOLATE THE NVRA

### A. The Plain Language of the NVRA Expressly Prohibits Georgia from Targeting Voters for Removal from the Registration Rolls "by Reason of" Their Failure to Vote."

The District Court erred in concluding that Section 234 does not violate the plain language of the NVRA. Taking into account the "design of the statute as a whole . . . and its object and policy," *Crandon v. United States*, 494 U.S. 152, 158 (1990), it is clear that Section 234's use of failure to vote to trigger a purge process "constitutes perhaps the plainest possible example of a process that 'result[s] in' removal of a voter from the rolls by reason of his or her failure to vote." *APRI*, 838 F.3d at 712.

The NVRA strictly limits the circumstances under which a voter can be removed from the rolls. These limitations, codified in Section 8 of the statute, 52 U.S.C. § 20507, are intended "to assure that voters' names are maintained on the rolls so long as they remain eligible to vote in their current jurisdiction and to assure that voters are not required to re-register except upon a change of voting address to one outside their current registration jurisdiction." S. Rep. No. 103-6, at 2 (1993); H.R. Rep. No. 103-9, at 18 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105, 122. This reflects Congress's goal in passing the NVRA to "increase the number of eligible citizens who register to vote," 52 U.S.C. § 20501(b)(1), and recognition that "registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by . . . racial minorities," *id.* § 20501(a)(3).

Section 8 of the NVRA states that a voter may be removed from the registration rolls only when the voter so requests or the voter has become ineligible by reason of criminal conviction, mental incapacity, death, or a change in residence. *Id.* § 20507(a)(3)-(4). Procedures that seek to remove voters who have become ineligible by reason of a change in residence must be part of a "general program that makes a *reasonable* effort" to remove such ineligible voters. *Id.* § 20507(a)(4) (emphasis added). Any such programs must be conducted "in accordance with subsections (b), (c), and (d)" of Section 8. *Id.* The plain meaning

of Subsections (b), (c) and (d), taken together, is that under the NVRA, a voter's failure to vote plays a very narrow role in the removal process; it serves solely as one component of a back-end procedure to *confirm* that a voter has changed residence, used only *after* the state has received an independent and affirmative indication that the voter has moved. *See generally id.* § 20507(a)-(d); *see also APRI*, 838 F.3d at 710-11.

Subsection (b) prohibits any voter-list maintenance program that "result[s] in the removal of the name of any person from the official list of voters . . . by reason of the person's failure to vote." 52 U.S.C. § 20507(b)(2) ("Failure-to-Vote Clause"). The Subsection, through an explanatory proviso added by the Help America Vote Act of 2002 ("HAVA"), also makes clear that the general prohibition on removing voters from the rolls for failure to vote should not "be construed to prohibit a State from using the procedures described in subsections (c) and (d)." *Id.* ("except that nothing in this paragraph may be construed to prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters") (hereinafter the "Except Clause").

When read properly, the Except Clause makes plain the back-end *confirmation* role failure to vote plays in the removal process. For instance, Subsection (c) sets forth the NVRA's model list-maintenance program, sometimes

called the "safe harbor." As described in this Subsection, states may use information obtained from the U.S. Postal Service's National Change of Address ("NCOA") system, a database of individuals and businesses that have forwarding addresses on file with the Postal Service, to identify voters who may have moved out of their registrar's jurisdiction.[5] *See id.* § 20507(c)(1). Once a state has received NCOA information for a particular voter, the NVRA permits the state to initiate a procedure, outlined in Subsection (d), designed to confirm the address change. That confirmation process starts by the state mailing the voter a notice to which the voter may respond to confirm or correct the change-of-address information. The voter's registration may then be canceled only if the voter: (1) confirms that he or she has moved out of state or to a new jurisdiction within the state where he or she would need to re-register; or (2) fails to respond to the notice and fails to vote during the two subsequent federal election cycles. *Id.* § 20507(d)(1) ("Address-Confirmation Procedure"). To be sure, states are not limited to using the NCOA system—other information affirmatively indicating a change of address may be used to initiate the removal process. But by prohibiting

---

[5] "Registrar's jurisdiction" refers to "the geographic reach of the unit of government that maintains the voter registration rolls." Kristine Cordier Karnezis, *Construction and Application of Provisional BallotingProvisions of the Help America Vote Act*, 10 A.L.R. Fed. 2d 653, § 8 (2006). The term is defined in Subsection 8(j) of the NVRA. *See* 52 U.S.C. § 20507(j).

removal of voters "by reason of" their failure to vote, Congress expressly

determined that failure to vote cannot *itself* be the reason for initiating the change-

of-address removal procedure outlined in Section 8(d). *See id.* § 20507(a)-(d).

Thus, the Except Clause added by HAVA did not alter or amend Subsection

8(b)(2)'s prohibition on removing a voter from the rolls by reason of their "failure

to vote." It merely clarifies that even though a voter's failure to vote generally

"shall not result in the removal" of the voter's name from the rolls, there is a

singular exception: when a state is using one's failure to vote as part of the

Address-Confirmation Procedure described above. 52 U.S.C. § 20507(b)(2).

Reading HAVA's provision in context makes this clear:

> Any State program or activity to protect the integrity of the electoral
> process by ensuring the maintenance of an accurate and current voter
> registration roll for elections for Federal office . . . shall not result in
> the removal of the name of any person from the official list of voters
> registered to vote in an election for Federal office by reason of the
> person's failure to vote, *except that* nothing in this paragraph may be
> construed to prohibit a State from using the procedures described in
> subsections (c) and (d) to remove an individual from the official list of
> eligible voters if the individual-- (A) has not either notified the
> applicable registrar (in person or in writing) or responded during the
> period described in subparagraph (B) to the notice sent by the
> applicable registrar; and then (B) has not voted or appeared to vote in
> 2 or more consecutive general elections for Federal office.

*Id.* (emphasis added). By citing Subsections (c) and (d), the Except Clause simply

clarifies that while the Failure-to-Vote Clause prohibits using failure to vote as the

reason for initiating removal, it does not prohibit using failure to vote as a

component of Subsection (d)'s very specific Address-Confirmation Procedure that occurs *after* a jurisdiction receives affirmative information—such as NCOA information obtained pursuant to Subsection (c)—indicating that a voter has changed residence. *See* Pub. L. No. 107-252, § 903 (2002) (headnote describing the amendment as a "[c]*larification* of [the] ability of election officials to remove registrants from [the] official list of voters on grounds of [a] change of residence") (emphasis added); *see also* 52 U.S.C. § 21145(a) ("[N]othing in [HAVA] may be construed to authorize or require conduct prohibited under [the NVRA], or to supersede, restrict, or limit the application of [the NVRA]."); H.R. Rep. No. 107-730, at 81 (2002) (Conf. Rep.) (noting that HAVA "leaves NVRA intact, and does not undermine it in any way" and that "[t]he procedures established by NVRA that guard against removal of eligible registrants remain in effect").

Despite these clear prohibitions in the statutory language, the District Court concluded that Section 234 does not "result in removal . . . by reason of the person's failure to vote" because "voters are removed from the rolls only if they fail to respond to the notification in addition to having no contact with the electoral process for seven years." Doc. 34 at 14-15. The NVRA cannot plausibly be read that way. Under the NVRA's "safe harbor," the voter's change of address, as reflected in the NCOA system, is quite plainly the cause of the voter's removal; the Address-Confirmation Procedure is used to confirm that change of address but it

15

does not break the causal link between the change-of-address information that triggered the removal process and the removal itself. Under Section 234, however, a voter's failure to vote takes the place of a change-of-address in the causal chain, rendering it just as plainly the cause of the voter's removal.

Further, as the *APRI* Court recognized, the District Court's "interpretation of the NVRA would render the [Failure-to-Vote C]lause entirely superfluous because Subsection (d)(1) already requires states to use the [Address-Confirmation P]rocedure." *APRI*, 838 F.3d at 711. Put differently, if Subsection 8(b)(2) is merely stating that the Address-Confirmation Procedure must be followed when a state suspects that a voter has changed her residence due to that voter's decision not to cast a vote, Subsection 8(b)(2), and more specifically the prohibition on removing a voter from the rolls by reason of the voter's failure to vote, would be rendered meaningless. There would be no reason for Congress to specifically require the Address-Confirmation Procedure be used when a removal is predicated on a failure to vote when it had already mandated the Address-Confirmation Procedure for *all* change-of-address removals. This Court should, like the Sixth Circuit, follow fundamental rules of statutory interpretation and "decline 'to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.'" *Id.* (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011)).

Nor is there meat to the District Court's suggestion that, by nature of incorporating the Address-Confirmation Procedure, Section 234 does not violate the NVRA's prohibition on removing voters based on failure to vote because voters must both fail to vote and fail to respond to a notice prior to removal. In fact, applying traditional rules of statutory interpretation, the *APRI* Court rejected this very argument. The *APRI* Court observed that this reading of the statute would inappropriately require the court to read the phrase "coupled with" "into the statute when Congress has left it out," *id.* at 708 (citing *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)), and violate the "traditional rule of statutory construction dictating that exceptions to a statute's general rules be construed narrowly," *id.* (citing *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739 (1989)).

Basic rules of statutory construction thus lead to one conclusion: Georgia's practice of using failure to vote to trigger removal from the voter rolls under Section 234 violates the plain terms of the NVRA. As the Sixth Circuit explained, that practice "constitutes perhaps the plainest possible example of a process that 'result[s] in' removal of a voter from the rolls by reason of his or her failure to vote." *Id.* at 712. The District Court's conclusion to the contrary should be reversed.

**B.** **Georgia's Use of Failure to Vote to Initiate Removal Procedures Does Not Constitute a "Reasonable Effort" to Identify Voters Who Have Become Ineligible by Reason of a Change in Address, as Required by the NVRA.**

In addition to violating Section 8's prohibition on removing voters "by reason of" their failure to vote, Section 234 violates the NVRA's roll-maintenance provisions because it does not constitute a "reasonable effort" to identify and remove voters from the rolls who have become ineligible by reason of a change in residence. *See* 52 U.S.C. § 20507(a)(4). Although the Sixth Circuit did not reach this issue, a close examination of Section 8's text, structure, purpose, and history demonstrates only change-of-address removal processes that are trigged by reliable evidence of change-of-address qualify as the "reasonable effort" to identify voters who are no longer eligible required by the NVRA. *See generally id.* § 20507(a), (c)-(d).

As the statutory language makes clear, states must have some independent and affirmative indication that a voter had moved before launching the Address-Confirmation Procedure. The purpose of the Address-Confirmation Procedure is to "*confirm*" that a voter has become ineligible to vote because the voter moved out of the jurisdiction where they are registered. *See, e.g.*, *id.* § 20507(c)(1)(B)(ii), (d)(1)(A) (emphasis added). In fact, the Address-Confirmation Procedure explicitly incorporates the requirement that the voter must "confirm[]" the change of address herself or fail to respond to the State's notice in a timely fashion before she can be

removed. *Id.* § 20507(d)(1)(A). The statute's use of the term "confirm" necessarily contemplates some prior affirmative indication that a voter has moved before the Address-Confirmation Procedure is deployed to verify or corroborate that information. *See Confirm*, Black's Law Dictionary (10th ed. 2014) (definition of "confirm" is "verify" or "corroborate").

That prior independent indication that a voter has moved must, moreover, be *reliable*, not a mere suspicion that a voter has moved. The plain terms of Section 8, construed in light of "the design of the statute as a whole[,] its object and policy," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) (quoting *Crandon*, 494 U.S. at 158), makes this clear. Section 8 requires states to "conduct a general program that makes a *reasonable* effort to remove" voters who have become ineligible by reason of a change in residence from the registration rolls. 52 U.S.C. § 20507(a)(4)(B). In *United States v. Missouri*, the court held that the term "reasonable" as used in this section carries its dictionary definition of "'agreeable to reason'; 'not extreme or excessive'; 'possessing sound judgment.'" No. 05-4391-CV-C-NKL, 2007 WL 1115204, at *7 (W.D. Mo. Apr. 13, 2007), *aff'd in relevant part*, 535 F.3d 844 (8th Cir. 2008) (quoting Webster's 7th New Collegiate Dictionary). Consistent with this reading, the U.S. Department of Justice has repeatedly noted that in order for a state's roll-maintenance program to constitute a "reasonable effort," it must "be based upon objective and reliable information of

potential ineligibility due to a change of residence that is independent of the

registrant's voting history." Doc. 19 at 12; *see also id.* at 15-18; Br. for the United

States as *Amicus Curiae* Supporting Plaintiffs-Appellants at 12-15, *APRI*, 838 F.3d

699, (No. 16-3746); The National Voter Registration Act of 1993 (NVRA),

*Questions and Answers* ¶ 34, Dep't of Justice (Sept. 1, 2016),

https://www.justice.gov/crt/national-voter-registration-act-1993-nvra ("A State can

only remove the name of a person from the voter registration list on grounds of

change of residence upon . . . reliable second-hand information indicating a change

of address outside of the jurisdiction from a source such as the NCOA

program . . . ."). In other words, a "reasonable effort" to maintain voter-registration

rolls must identify with reasonable accuracy those voters who have lost eligibility

due to a change in residence and, conversely, it must make a reasonable effort to

avoid removing voters who remain eligible. *See, e.g.*, 52 U.S.C. § 20507; S. Rep.

No. 103-6, at 19; H.R. Rep. No. 103-9, at 18, *as reprinted in* 1993 U.S.C.C.A.N. at

122.

Section 8(c) of the NVRA provides an example of what a "reasonable

effort" entails. Specifically, the Subsection requires any state that relies on NCOA

information to identify voters who have likely moved out of their jurisdiction of

registration to use the Address-Confirmation Procedure "to *confirm* the change of

address" of voters flagged by the NCOA database as having moved.[6] 52 U.S.C.

§ 20507(c)(1)(B)(ii) (emphasis added). Although use of NCOA information is not

mandatory, Congress's decision to provide it as the only example of an acceptable

program strongly suggests that states must have comparably reliable evidence to

trigger the process for removing voters based on a change of residence.[7] *See* S.

Rep. No. 103-6, at 19 ("Jurisdictions which choose not to use the [Postal Service]

program should implement another reasonable program[.]"). In sum, only after

NCOA data or other similarly reliable information indicates that a voter may have

moved may a state consider an individual's voting activity as part of the Address-

Confirmation Procedure to confirm that the voter has changed residence.

Section 234 fails to satisfy this requirement. Targeting voters for removal

based on failure to vote results in the removal of voters not based on any objective

or reliable evidence that a voter has become ineligible due to a change in residence,

but because the voter infrequently participates in the democratic process. Failure to

_____

[6] If a state uses this procedure, it will have met its obligation to undertake a "reasonable effort" to identify and remove voters who have become ineligible by reason of a chance in address. 52 U.S.C. § 20507(a)(4), (c)(1).

[7] The House Report on the NVRA, as well as the U.S. Department of Justice's NVRA guidance suggest that mailings returned as undeliverable could serve as another reliable source of evidence that a voter may have moved. *See, e.g.*, H.R. Rep. No. 103-9, at 15-16, *as reprinted in* 1993 U.S.C.C.A.N. at 119-120; NVRA, *Questions and Answers* ¶ 33, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.

vote does not reliably indicate that a voter has changed residence—given the sadly low turnout of American elections, that would suggest that forty percent or more of the nation's voters change residence during every federal election cycle—which is clearly not the case. *See* S. Rep. No. 103-6, at 18; Press Release, U.S. Census Bureau, U.S. Mover Rate Remains Stable at About 12 Percent Since 2008, Census Bureau Reports (Mar. 18, 2015), *available at* https://www.census.gov/newsroom/ press-releases/2015/cb15-47.html (noting that "[f]or the past several years, the mover rate has remained between 11.5 and 12.5 percent").[8] As discussed more below, Section 234's use of failure to vote to trigger the Address-Confirmation Procedure thus subverts the foundational principles of the NVRA and simply cannot constitute a "reasonable effort" to identify ineligible voters on the rolls.

## II. GEORGIA'S PRACTICE OF REMOVING INFREQUENT VOTERS FROM THE REGISTRATION ROLLS DAMAGES DEMOCRATIC PARTICIPATION.

Section 234 not only violates the NVRA, but it perpetuates an evil that Congress explicitly sought to eliminate in passing the NVRA—penalizing voters for exercising their right not to cast a vote. In doing so, the practice creates an inefficient system that requires individuals to needlessly re-register, places

---

[8] *See also* Press Release, U.S. Census Bureau, Americans Moving at Historically Low Rates, Census Bureau Reports (Nov. 16, 2016), *available at* https://www.census.gov/newsroom/press-releases/2016/cb16-189.html (reporting that "percentage of Americans moving over a one-year period fell to an all time low in the United States to 11.2 percent in 2016").

additional burdens on election administrators, and removes eligible voters from the rolls, resulting in their disenfranchisement and disillusion with the electoral system. These harms are precisely those that Congress sought to avoid when it passed the NVRA.

Congress understood that the failure to vote does not indicate that a voter has changed residence. *See* S. Rep. No. 103-6, at 18. In forbidding states from removing voters from the rolls "by reason of" their failure to vote, Congress sought to protect the right of citizens to choose whether to vote, and prevent voters from being removed as long as they remain eligible or punished for exercising their right not to cast a ballot in a particular election. *See, e.g.*, *id.* at 17-18. The NVRA's legislative history is replete with references to the unfairness of "penaliz[ing] . . . non-voters by removing their names from the voter registration rolls merely because they have failed to cast a ballot in a recent election," *id.* at 17, or "fail[ed] to respond to a mailing." H.R. Rep. No. 103-9, at 15, *as reprinted in* 1993 U.S.C.C.A.N. at 119.[9]

_____

[9] *See also*, *e.g.*, S. Rep. No. 103-6, at 2 (The NVRA "provide[s] procedures and standards regarding the maintenance [of registration rolls] to assure that voters' names are maintained on the rolls so long as they remain eligible to vote in their current jurisdiction and to assure that voters are not required to re-register except upon a change of voting address to one outside their current registration jurisdiction."). Congress was aware this practice had the effect, and in some cases the purpose, of reducing registration rates and, consequently, participation in federal elections. *E.g.*, H.R. Rep. No. 103-9, at 2, *as reprinted in* 1993

Given these realities, Congress recognized in passing the NVRA that practices like those that exist in Georgia are "highly inefficient and costly" because they "require[] eligible citizens to re-register when they have chosen not to exercise their vote, [and] also unnecessarily place[] additional burdens on the registration system because persons who [were] legitimately registered must be processed all over again." S. Rep. No. 103-6, at 18. In addition, Congress recognized that "registration laws and procedures can have a direct and damaging effect on voter participation in elections." 52 U.S.C. § 20501(a)(3); *see also* H.R. Rep. No. 103-9, at 3, *as reprinted in* 1993 U.S.C.C.A.N. at107 (noting that the "primary reason . . . eligible citizens" cite for not voting is the "failure to be[] registered").

And Congress's concern has been borne out. As the documented experiences of voters in Ohio vividly illustrate, voter purge practices that target and remove infrequent voters from the registration rolls have disenfranchised countless eligible voters who had properly registered but were removed from the rolls as a result of these voters' mere exercise of their right not to cast a ballot. Take, for instance, the experience of Larry Harmon, a U.S. military veteran and long-time Ohio citizen who had exercised his right not to vote for several election cycles because he had

U.S.C.C.A.N. at 106 (identifying "annual reregistration requirements" as among "the techniques developed to discourage participation" around the turn of the twentieth century; S. Rep. No. 103-6, at 3 (same).

been uninspired by recent candidates and ballot measures. *See, e.g.*, Pls. Mot. for

Sum. J. at 12, *APRI v. Husted*, No. 16-cv-303-GCS-EPD (S.D. Ohio 2016), ECF

No. 39; Pls. First Amended Compl. at 12-13, *APRI v. Husted*, No. 16-cv-303-GCS-

EPD, (S.D. Ohio 2016), ECF. No. 37. When Ohio conducted its last statewide

purge of infrequent voters in the summer of 2015, Mr. Harmon's name was

removed from the registration rolls. Pls. Mot. for Sum. J. at 12, *APRI v. Husted*.

When Mr. Harmon returned to the polls to exercise his right to vote in November

2015, he learned for the first time that he was no longer registered to vote. *Id.* at

20. During the November 2015 and March 2016 elections, Mr. Harmon's

experience was shared by voters across the State of Ohio. In just a small sample of

Ohio counties, nearly 600 voters were denied their right to vote in these elections

because they had been purged based on inactivity. *Id.* at 14-16. All these

individuals had properly registered but were nevertheless removed from the voter

rolls and prevented from voting, not because they had become ineligible, but

because they had elected not to cast a ballot. *Id.*

Many more Ohio voters in November 2016 would have been

disenfranchised in the same way but for the Sixth Circuit's determination that

Ohio's use of a voter's failure to vote as the basis for purging voters from the

registration rolls violated the NVRA. Because of the Sixth Circuit's decision,

voters who had been purged since 2011 because they had elected not to vote (i.e.,

those voters who had last voted in 2005) were able to cast a provisional ballot that counted if they appeared in person to vote in the November 2016 General Election. This relief served as the safety net that prevented more than 7,500 Ohio voters from being disenfranchised in last November's election. Georgia voters have no such protection and eligible voters will continue to be systematically removed from the rolls and denied their right to vote if Section 234 remains intact.

The right to vote is one of the most basic and fundamental rights established by the U.S. Constitution. *See, e.g.*, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."). However, Georgia's purge practice strips individuals of this fundamental right by unlawfully removing eligible voters from the rolls and denying them the right to participate in the democratic process and have their voices heard.

## CONCLUSION

For the reasons set forth above and in the Appellants' opening brief, this Court should reverse the District Court's judgment and remand for further proceedings.

Dated: June 12, 2017        Respectfully submitted,

s/ *Sophia Lin Lakin*
Sophia Lin Lakin
Dale E. Ho
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION, INC.
125 Broad Street
New York, NY 10004
(212) 519-7836
slakin@aclu.org
dho@aclu.org

Stuart C. Naifeh
Naila S. Awan
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(212) 633-1405
snaifeh@demos.org
nawan@demos.org

Sean J. Young
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION OF GEORGIA, INC.
PO Box 77208
Atlanta, GA 33057
(678) 981-5295
syoung@acluga.org

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 29(a)(4)(G) and 32(g)(1) of the Federal Rules of Appellate Procedure ("Fed. R. App. P."), the undersigned hereby certifies that this document complies with Fed. R. App. P. 29(a)(5) and is no more than one-half of the type-volume limitations for a principal brief set forth in Fed. R. App. P. 32(a)(7)(B).

This document has been prepared in proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font. Exclusive of the exempted portions of the brief set forth in Fed. R. App. P. 32(f) and Rule 32-4 of this Court, the undersigned hereby certifies that this document contains **6,344** words, as determined by a word processing system used to prepare this brief.

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of June, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin