17-11315

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

COMMON CAUSE and GEORGIA
STATE CONFERENCE OF THE NAACP,

                          Plaintiffs/Appellants,

v.

BRIAN KEMP, individually and in his
official capacity as SECRETARY
OF STATE of the State of Georgia,

                          Defendant/Appellee.

_____

On Appeal from the United States District Court
for the Northern District of Georgia

_____

## BRIEF OF APPELLEE
## SECRETARY OF STATE BRIAN KEMP

_____

Christopher M. Carr
  *Attorney General*
Annette M. Cowart
  *Deputy Attorney General*
Russell D. Willard
  *Senior Assistant Attorney
  General*
Cristina M. Correia
  *Assistant Attorney General*
Josiah B. Heidt
  *Assistant Attorney General*

*Counsel for Appellee*

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 656-3300
ccorreia@law.ga.gov

Common Cause v. Kemp, No. 17-11315

## **CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

The undersigned attorney for Appellee hereby certifies, pursuant to 11 Cir. R. 26.1-1, that the following have an interest in the outcome of this appeal:

- Batten, Hon. Timothy C., Sr., U.S. District Court Judge;

- Bondurant, Emmet J., II, Attorney for Plaintiffs/Appellants;

- Carr, Christopher M., Attorney General, Attorney for Secretary Kemp;

- Carter, Jason James, Attorney for Plaintiffs/Appellants;

- Common Cause, Plaintiff/Appellant;

- Correia, Cristina M., Asst. Attorney General, Attorney for Secretary Kemp;

- Cowart, Annette M., Deputy Attorney General, Attorney for Secretary Kemp;

- Dellheim, Richard A., Attorney for the U.S. Department of Justice;

- Georgia State Conference of the NAACP, Plaintiff/Appellant;

- Heidt, Josiah B., Asst. Attorney General, Attorney for Secretary Kemp;

- Herren, T. Christian, Jr., Attorney for the U.S. Department of Justice;

- Horn, John A., United States Attorney, Northern District of Georgia;

- Kemp, Brian, Secretary of State, Defendant/Appellant;

- Lennon, Chad K., Attorney for Plaintiffs/Appellants;

- Mendel, Gabriel A., Assistant U.S. Attorney;

- Pinson, Andrew A., Deputy Solicitor General, Attorney for Secretary Kemp;

- United States Department of Justice, Interested Party;

- Warren, Sarah Hawkins, Solicitor General, Attorney for Secretary Kemp;

- Willard, Russell D., Senior Asst. Attorney General, Attorney for Secretary Kemp.


/s/Josiah B. Heidt_____
   Josiah B. Heidt
   Ga. Bar No.  104183

# STATEMENT REGARDING ORAL ARGUMENT

Appellees do not believe oral argument is necessary in this case. Pursuant to FED.R.APP.P. 34(a)(2)(C), "the facts and legal arguments are adequately presented in the briefs and records, and the decisional process would not be significantly aided by oral argument."

If the Court decides that oral argument is necessary, Secretary Kemp requests that the Court not hold argument until after the United States Supreme Court has issued its opinion in *Husted v. A. Philip Randolph Inst.*, No. 16-980, 2017 U.S. LEXIS 3506, 2017 WL 515274 (May 30, 2017) (granting certiorari), which will address the same issues presented in this case.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement..................C1

Statement Regarding Oral Argument........................................................................i

Table of Contents....................................................................................................ii

Table of Citations...................................................................................................iv

Statement of Issues Presented For Review..............................................................1

Statement of the Case.............................................................................................2

    Introduction....................................................................................................2

    Procedural history...........................................................................................4

    Statutory Framework......................................................................................6

Summary of the Argument....................................................................................12

Argument and Citations of Authority...................................................................14

I.     Georgia's List-Maintenance Program Does Not Violate the NVRA and HAVA, Which Only Prohibit Removing Voters Based Solely on Their Failure to Vote...............................................................................................14

    A.    HAVA and the 2002 amendment to the NVRA clarified that states may consider a voter's failure to appear to vote when removing a voter for change of residence..........................................................15

    B.    The NVRA incorporates a proximate-cause standard.........................17

    C.    The phrase "by reason of" does not have the same meaning as "results in.".................................................................................................20

    D.    The Clarification Amendment is a proviso and not and not an exception to a general prohibition.......................................................23

E.      Appellants misconstrue the structure of Sec. 8.................................26

       i.      Use of the USPS Safe Harbor Process is optional....................28

      ii.      Appellants ignore the legislative history of Sec. 8(b)...............32

F.      The Department of Justice's 1994 objection, pursuant to Section 5 of the Voting Rights Act, to Georgia's former statute, has no relevance to whether current Georgia Law violates the current language of the NVRA..................................................................................................35

II.    Georgia's List-Maintenance Provisions Do Not Violate the First Amendment....................................................................................................36

      A.      Georgia's list maintenance program does not unconstitutionally interfere with Appellants' asserted right to both not vote and remain on Georgia's voter registration list.........................................37

      B.      Even assuming Appellants have a right not the vote, the district court correctly held that Georgia law does not infringe on appellants' First Amendment rights.................................................................38

       i.      The proper standard for analyzing whether a statute infringes on voting rights is the Supreme Court's Anderson-Burdick balancing test..........................................................................39

      ii.      O.C.G.A. § 21-2-234 also passes a forum-based analysis........40

     iii.      Appellants' reliance on Hoffman to argue that the O'Brien speech/non-speech test should apply here is misplaced...........42

      C.      The district court correctly dismissed the complaint prior to hearing evidence........................................................................................45

Conclusion.............................................................................................................48

Certificate of Compliance......................................................................................49

Certificate of Service.............................................................................................50

# TABLE OF CITATIONS

Cases                                                                    Page

*A. Philip Randolph Inst. v. Husted*, 838 F.3d 699 (6th Cir. 2016)......................5, 19

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)..........................................................39

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)..................................................................................................................21

*Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)..........................................................21

*Burdick v. Takushi*, 504 U.S. 428 (1992)..................................................................39

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010)..................................................................................................................41–42

*Colon-Marrero v. County-Perez*, 703 F.3d 134 (1st Cir. 2012)..............................37

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985).....41–42

*Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008)............................33

*CSX Transp., Inc. v. McBride*, 564 U.S. 685 (2011).........................................17, 25

*Erlenbaugh v. United States*, 409 U.S. 239 (1972)..................................................25

*FTC v. Mandel Bros.*, 359 U.S. 385 (1959).........................................................22, 30

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010)........................................17

*Hoffman v. Maryland*, 928 F.2d 646 (4th Cir. 1991)...................................38, 43–44

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)...........................................21

*Husted v. A. Philip Randolph Inst.*, No. 16-980, 2017 U.S. LEXIS 3506, 2017 WL 515274 (2017)..................................................................................................................6

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011)....................................41

*Martson v. Lewis*, 410 U.S. 679 (1973)....................................................47

*Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207 (2012).......................21

*Quackenbush v. United States*, 177 U.S. 20 (1900)................................................24

*Storer v. Brown*, 415 U.S. 724 (1974)....................................................40

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).......................39, 40

*Torres v. Lynch*, 136 S. Ct. 1619 (2016)..................................................19

*United States v. Cook*, 84 U.S. 168 (1872)..............................................23

*United States v. O'Brien*, 391 U.S. 367 (1968)........................................42

U.S. Constitution, Statutes, and Rules                                    Page

52 U.S.C. § 20501...........................................................................2, 7

52 U.S.C. § 20507.........................................................................passim

52 U.S.C. § 21083......................................................................7, 8, 15

52 U.S.C. § 21085.............................................................................8

FRAP 34(a)(2)(c)................................................................................i

Help America Vote Act of 2002 (HAVA), Pub. L. No. 107-252, 116 Stat. 1666.............................................................3, 7, 9, 16, 24, 29

National Voter Registration Act of 1993, Pub. L. 103-31, 107 Stat. 77..............................................................................................2, 29

Georgia Statutes                                                          Page

1994 Ga. Laws 1443............................................................................35

1997 Ga. Laws 649..............................................................................35

O.C.G.A. § 21-2-233...............................................................28

O.C.G.A. § 21-2-234.........................................................passim

O.C.G.A. § 21-2-235...............................................4, 11, 35–36, 46

Legislative History                                                        Page

148 Cong. Rec. S10509 (daily ed. Oct. 16, 2002) (statement of Sen. Dodd)...33, 47

H.R. Rep. No. 107-730 (2002) (Conf. Rep.)..............................24, 34–35

H.R. Rep. No. 103-9 (1993).......................................31–32, 47

S. Rep. No. 103-6 (1993).........................................31–32, 47

Government Agency Sources                                                  Page

U.S. Postal Serv., Office of the Inspector Gen., Report No. MS-MA-15-006, Strategies for Reducing Undeliverable as Addressed Mail 15 (May 1, 2015), https://goo.gl/vOyQDl.........................................................33, 46

Other Authorities                                                          Page

1A *Sutherland Statutory Construction* § 21:11 (7th ed.)........................23

2A *Sutherland Statutory Construction* § 47:11 (7th ed.)........................23

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012).................................................................19, 24

*Cambridge Phrasal Verbs Dictionary* (2d ed. 2006).............................19

*Merriam-Webster Online Dictionary*, http://www.merriam-webster.com.............19, 26

*Oxford Dictionary of Phrasal Verbs* (1st ed. 1993)..............................19

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Does Georgia's list maintenance program, which requires election officials
to send address confirmation postcards to voters who have not had contact
with election officials in the previous three calendar years, violate the
NVRA's requirement that voters not be removed from registration lists
solely by reason of their failure to vote when the NVRA is 1) silent as to
what events may trigger the mailing of a confirmation postcard and 2)
expressly authorizes a voter's removal if they fail to respond to a
confirmation postcard and fail to appear to vote for two subsequent federal
elections?

2.      Do voters have a First Amendment right not to vote and to remain on
Georgia's voter registration list?  If so, does the fact that Georgia's voter
registration list maintenance program requires voters either to have contact
with election officials once every three years or respond to a postage-
prepaid postcard inquiring about their residence violate the First
Amendment?

## STATEMENT OF THE CASE

**Introduction**

With the National Voter Registration Act of 1993 (NVRA), Pub. L. No. 103-21, 107 Stat. 77 (codified as amended at 52 U.S.C. §§ 20501–20511 (2016)), Congress sought, among other things, "to protect the integrity of the electoral process" and "to ensure that [States maintain] accurate and current voter registration rolls." 52 U.S.C. § 20501(b)(3)–(4). To protect the integrity of the electoral process, Sec. 8 of the NVRA requires each State to "conduct a general program that makes a reasonable effort to remove" from its voter-registration list the name of any person who has moved or passed away. *Id.* at § 20507(a)(4). It then subjects States to two seemingly conflicting mandates. It prohibits them from removing a person's name "by reason of the person's failure to vote." *Id.* at § 20507(b)(2). It then prohibits them from removing a person's name on the ground that the person has moved unless the person fails to respond to an address-confirmation notice and subsequently fails to vote in the next two consecutive general elections for federal office. *Id.* § 20507(d)(1)(B). These requirements and prohibitions in Sec. 8 are collectively known as the NVRA's "list maintenance" provisions. Four aspects of the NVRA are at the center of Appellants' challenge to Georgia's list maintenance program:

(1) The "Failure-To-Vote Clause" provides that a State's list-maintenance program "shall not result in the removal of the name of any person from the official list of voters . . . by reason of the person's failure to vote . . . ." *Id.* § 20507(b)(2).

(2) The "Clarification Amendment," which was added to the NVRA by Sec. 903 of the Help America Vote Act of 2002 (HAVA), Pub. L. No. 107-252, 116 Stat. 1666, 1728, clarifies that a voter may be removed if they fail to return the postcard notification in Sec. 8(d) of the NVRA and fail to appear to vote for two additional federal election cycles. 52 U.S.C. § 20507(b)(2).

(3) The "USPS Safe-Harbor Process" provides that a State "may" use "change-of-address information supplied by the Postal Service . . . to identify registrants whose addresses may have changed." *Id.* § 20507(c)(1)(A).

(4) The "Address-Confirmation Procedure" provides that a State "shall not remove the name of a registrant from the official list of eligible voters . . . on the ground that the registrant has changed residence" unless the person fails to respond to an address-confirmation notice and subsequently fails to vote or appear to vote in the next two consecutive general elections for federal office. *Id.* § 20507(d)(1)(B).

**Procedural History**

Appellants, two non-profit organizations, sued the Georgia Secretary of State in his individual and official capacities in the U.S. District Court for the Northern District of Georgia on February 10, 2016 challenging the State of Georgia's voter registration list maintenance program as a violation of Sec. 8(b) of the NVRA and the First Amendment. R-1 at ¶¶ 41, 43. Appellants sought a declaratory judgement that O.C.G.A. § 21-2-234 violates the NVRA and the First Amendment and an injunction to prevent the statute from being enforced. On March 4, 2016, Secretary Kemp filed a motion to dismiss the complaint for failure to state a claim. R-10. Defendant Kemp argued (1) that the individual capacity claim should be dismissed because equitable relief is not available against a state official in his *individual* capacity; (2) that Georgia's list maintenance program, as outlined in O.C.G.A. §§ 21-2-234 and 21-2-235, is consistent with both the express language and the congressional intent of the NVRA, as amended; and (3) that Appellants' First Amendment claim fails because Georgia law does not severely burden Plaintiffs' right "not to vote," and the State's interest in maintaining accurate registration lists sufficiently justifies the restriction. R-10-1 at 1–2. The United States filed a Statement of Interest arguing that Georgia's use of voter inactivity as a reason to mail the confirmation postcard violated the NVRA. R-19. The United States took no position on Appellants' First Amendment claim. *Id.*

On March 17, 2017, the district court granted the Secretary's motion to dismiss. R-34. The court held that "Georgia's [voter] removal process, which closely mirrors the language of the NVRA and HAVA [the Help America Vote Act], does not violate those statutes." R-34 at 16. Among other things, the court determined that Georgia's list-maintenance program does not "result in removal … by reason of the person's failure to vote" because it only permits removal based on both seven years without contact from the voter and failure to return the confirmation postcard. R-34 at 14–15. The court also rejected the plaintiffs' First Amendment challenge. R-34 at 16–21.

On May 30, 2017, a few days before the Appellants filed their appellate brief in this Court, the United States Supreme Court granted a writ of certiorari to determine whether Ohio's list-maintenance program violates the NVRA. That program is similar to Georgia's program: Registered Ohio voters who have not engaged in any "voter activity" in the past two years are sent a confirmation notice, and voters who both fail to respond to the confirmation notice and engage in no voter activity for four additional years are removed from the voter list. *See A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 703 (6th Cir. 2016). The Sixth Circuit struck down Ohio's list-maintenance program, holding that it "result[s] in the removal [of a person] by reason of the person's failure to vote" in violation of the NVRA and HAVA. *Husted*, 838 F.3d at 707 (quoting 52 U.S.C.

§ 20507(b)(2)).  The Supreme Court granted certiorari on the question whether "52 U.S.C. § 20507 permit[s] Ohio's list-maintenance process, which uses a registered voter's voter inactivity as a reason to send a confirmation notice to that voter under the NVRA and HAVA." *Husted v. A. Philip Randolph Inst.*, No. 16-980, Pet. at i*; see also Husted v. A. Philip Randolph Inst.*, No. 16-980, 2017 U.S. LEXIS 3506, 2017 WL 515274 (May 30, 2017) (granting certiorari).

On June 14, 2017, Secretary Kemp filed a motion requesting this Court to hold this case in abeyance pending the U.S. Supreme Court's decision in *Husted*, No. 16-980.  Appellants filed a response in opposition to this motion on June 26, 2017 (amended July 5, 2017).

**Statutory Framework**

In 1993, Congress enacted the NVRA to require States to establish a uniform system for voter registration.  Under the statute, a State's uniform system "shall not result in the removal of the name of any person from the official list of voters ... by reason of the person's failure to vote."  52 U.S.C. § 20507(b)(2). The Act also sets out notice requirements for removing voters from rolls for a change of residency: The registrant must fail to respond to a postage-prepaid and pre-addressed residency confirmation card.  *Id.* at §§ 20507(b)(2)(A) & (d)(1)–(2). If, after failing to respond to the residency confirmation card, the registrant "has not voted or appeared to vote in 2 or more consecutive general elections for Federal office," he

6

or she may be removed.  *Id.* at § 20507(b)(2)(B).  Finally, the NVRA provides

States a "safe harbor" process to determine if registrants' addresses have changed:

they "may" use "change-of-address information supplied by the Postal Service . . .

to identify registrants whose addresses may have changed."  *Id.* at

§ 20507(c)(1)(A).

In 2002, Congress passed the Help America Vote Act of 2002 (HAVA),

Pub. L. No. 107-252, 116 Stat. 1666, 1728.  HAVA requires states to maintain a

"single, uniform, official, centralized, interactive computerized statewide voter

registration list defined, maintained, and administered at the State level."  52

U.S.C. § 21083(a)(1)(A).  The statute also requires the states to make reasonable

efforts in maintaining accurate voter-registration records.  States are specifically

required to maintain:

> A system of file maintenance that makes a reasonable effort to remove
> registrants who are ineligible to vote from the official list of eligible
> voters.  Under such system, consistent with the National Voter
> Registration Act of 1993 (42 U.S.C. § 1973gg et seq.) [currently
> codified at 52 U.S.C. § 20501], registrants who have not responded to
> a notice and who have not voted in 2 consecutive general elections for
> Federal office *shall* be removed from the official list of eligible voters,
> except that no registrant may be removed *solely* by reason of a failure
> to vote.

*Id.* at § 21083(a)(4)(A) (emphasis added).[1]  In other words, states are *required* to

remove from their voter registration lists those voters that do not respond to a

notice and do not vote, or appear, in the following two (2) federal elections.

Congress amended the NVRA with Sec. 903 of HAVA to clarify that states,

pursuant to a list-maintenance program, may remove voters from their lists for

change of residency *if* the voter failed to respond to a the confirmation postcard

notice *and* then failed to appear to vote in two subsequent federal elections.

Congress made this clarification by amending the "failure to vote" language of

Sec. 8(b) of the NVRA to read:[2]

> (b) Confirmation of voter registration. Any State program or
> activity to protect the integrity of the electoral process by ensuring the
> maintenance of an accurate and current voter registration roll for
> elections for Federal office—
>
> > (1) shall be uniform, nondiscriminatory, and in compliance with
> > the Voting Rights Act of 1965 (42 U.S.C. 1973 *et seq*. [52
> > USCS §§ 10301 et seq.]); and
>
> > (2) shall not result in the removal of the name of any person
> > from the official list of voters registered to vote in an election
> > for Federal office by reason of the person's failure to vote,
> > <u>except that nothing in this paragraph may be construed to</u>

---

[1] HAVA provides further that "[t]he specific choices on the methods of complying
with the requirements of [Title III, i.e., 52 U.S.C. §§ 21081-21084] shall be left to
the discretion of the State." 52 U.S.C. § 21085.  In other words, federal law
requires the states to design their own list maintenance plans, consistent with
HAVA and the NVRA.

[2] The language added in 2002 is underlined.

prohibit a State from using the procedures described in subsections (c) and (d) to remove an individual from the official list of eligible voters if the individual—

> (A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then

> (B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office.

Sec. 903, Pub. L. No. 107-252, 116 Stat. 1728, codified at 52 U.S.C. § 20507(b) (additions underlined).

Sec. 8(d) of the NVRA, as amended, sets forth requirements for any change of residence list maintenance program established by the States (the Address-Confirmation Procedure). More specifically, Sec. 8(d) provides that states "shall not" remove voters from their rolls due to a change of residency unless the voter either confirms in writing that they have moved outside of the jurisdiction *or* the voter fails to return a "notice" and "has not voted *or appeared to vote*" in the next two federal elections. 52 U.S.C. § 20507(d)(1) (emphasis added).[3] The "notice" must be a "postage prepaid and pre-addressed return card, sent by forwardable

_____

[3] The requirement in the NVRA, like the requirement in the Georgia statute at issue, O.C.G.A. § 21-2-234, is not that voters vote but that they have some contact with election officials. *See* 52 U.S.C. § 20507(d)(1)(B)(ii).

mail" and provide the information set out in detail in the statute. *Id.* at

§ 20507(d)(2).

One aspect of Georgia's list-maintenance program is set forth in O.C.G.A.

§ 21-2-234. Under that statute, during the first six months of an odd-numbered

year, the Secretary of State identifies the persons on the voter registration list with

whom there has been no contact during the preceding three (3) calendar years.[4]

O.C.G.A. § 21-2-234(a)(2).

The term "no contact," as defined in the statute, means

> that the elector has not filed an updated voter registration card, has not
> filed a change of name or address, has not signed a petition which is
> required by law to be verified by the election superintendent of a
> county or municipality or the Secretary of State, has not signed a
> voter's certificate, and has not confirmed the elector's continuation at
> the same address during the preceding three calendar years.

O.C.G.A. § 21-2-234(a)(1). The Secretary then creates an address-confirmation

notice that includes a postage-prepaid, preaddressed return card that follows the

requirements of both O.C.G.A. § 21-2-234(c) and 52 U.S.C. § 20507(d)(2). Those

cards are provided to county election officials who send them to the voters at their

last known addresses. The voter can return the card and confirm that address, or

indicate that he or she has moved, or that some other update is needed. *See*

---

[4] Because this process is only conducted in odd-numbered years, looking back
three (3) years at a voter's contacts necessarily includes considering two even
numbered years and therefore includes two prior federal elections.

O.C.G.A. § 21-2-234(d), (e), and (f).  However, if the card is not returned within the 30 days outlined in the notice, the person's name is moved from the list of "active" voters to "inactive" voters.  O.C.G.A. § 21-2-234(c)(2) and (g).  On the other hand, as noted above, if the card is returned with the confirmation or with new information, then the voter's registration is updated appropriately, and the voter remains on the list of "active" voters.  O.C.G.A. § 21-2-234 (d), (e), and (f).

Consistent with the NVRA, movement from the "active" to the "inactive" list does not mean the person has been removed from the registration list.  The person is still registered to vote, and, if the voter has any contact with the electoral system — including but not limited to voting — the voter will move back to the "active" voters list.  O.C.G.A. § 21-2-235.  However, if two more federal general election cycles pass and there is still "no contact" of any of the enumerated kinds between the voter and state or local election officials, then the voter is removed from the registration list.  O.C.G.A. § 21-2-235(b).  In short, voters are only removed from Georgia's voter-registration list if they have not had *any contact* (as defined in the statute) with election officials in Georgia for a minimum of seven years, including four federal election cycles, *and* they have not returned a postage prepaid, preaddressed return card to confirm their residence.

## SUMMARY OF THE ARGUMENT

The NVRA requires States to maintain accurate voter registration lists under Section 8 of the statute.  In satisfying this requirement, States must ensure, among other things, that voters are not removed from the registration list solely by reason of their failure to vote.  The district court correctly held that the portion of Georgia's list maintenance program at issue here, O.C.G.A. § 21-2-234, does not violate the NVRA because it does not result in the removal of voters solely by reason of their failure to vote.  As the district court held, nothing in the NVRA prohibits a State from using failure to vote data as one basis for sending registrants a notification postcard to determine whether they have moved so long as the State follows the Address-Confirmation Procedure in Sec. 8(d), and the State's program as a whole is "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965."  R-34 at 13–15

On appeal, Appellants make a number of new statutory interpretation arguments to attack the district court's conclusion that O.C.G.A. § 21-2-234 does not violate the NVRA.  First, Appellants use  the wrong definition of terms in the statute.  Under a proper interpretation of the NVRA, the Failure-To-Vote Clause provides that a State's list-maintenance program "shall not *result in*"—*i.e.,* cause or produce—"the removal of the name of any person from the official list of voters . . . *by reason of*"—*i.e.*, as a proximate cause of—"the person's failure to vote."

12

Second, Appellants misconstrue the structure of Sec 8 to read requirements into the provision that do not exist. Using the term "in accordance with" from the statute, States must actually only ensure that their list maintenance programs agree with or follow the provisions of subsections (b), (c), and (d); thus, requiring only that the portions of States' list maintenance programs that implicate the requirements in subsections (b), (c), and (d) follow those requirements.

Third, Appellants misread the Clarification Amendment to Sec. 8(b)(2) to claim that States can *only* use the USPS Safe-Harbor Process (along with the Address-Confirmation Procedure) if the State considers failure-to-vote data as part of its list maintenance program. Under the language in Sec. 8(c)(1), a State *may* use the USPS Safe-Harbor Process to meet the NVRA's requirement that each state establish a voter roll maintenance program to remove voters for a change in residence, but this process is not mandatory. 52 U.S.C. § 20507(c)(1)(A).

Finally, Georgia's list-maintenance provisions do not violate the First Amendment. First, no court has ever held that voters have a First Amendment right not to vote, much less a right to both not vote and remain on a voter registration list. Second, Georgia's list maintenance program does not unconstitutionally interfere with appellants' asserted right to both not vote and remain on Georgia's voter registration list. Even assuming Appellants have a right

not the vote, the district court correctly held that Georgia's list maintenance statute does not violate the First Amendment.

The district court's dismissal of Appellants' complaint for failure to state a claim should be affirmed.

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.  Georgia's List-Maintenance Program Does Not Violate the NVRA and HAVA, Which Only Prohibit Removing Voters Based *Solely* on Their Failure to Vote.**

This Court should affirm the district court's holding that Georgia's list maintenance program does not violate the NVRA.  The NVRA is silent on when and how a State may decide to send out postcard notifications as part of the State's list maintenance process.  *See* R-34 at 13.  The district court correctly held that nothing in the NVRA prohibits a State from using failure to vote data as one basis for sending registrants a notification postcard so long as the State follows the Address-Confirmation Procedure in Sec. 8(d), and the program as a whole is "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." R-34 at 13–15.  The district court correctly rejected Appellants' argument, repeated here, that the NVRA prohibits States from ever considering failure to vote as part of list maintenance.

**A.**    **HAVA and the 2002 Amendment to the NVRA clarified that States may consider a voter's failure to appear to vote when removing a voter for change of residence.**

HAVA provides that:

> registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office **shall** be removed from the official list of eligible voters, except that no registrant may be removed ***solely*** by reason of a failure to vote.

52 U.S.C. § 21083(a)(4)(A) (emphasis added).  Georgia, of course, does not violate this provision.  It removes voters only if they have had no contact for three years, plus they have not returned a confirmation postcard, plus they have not had contact for an additional two federal election cycles.  O.C.G.A. § 21-2-234.

Consistent with the word "solely" in HAVA, the NVRA was amended to make clear that nothing in Section 8(b) of the NVRA prohibits the removal of a voter's name, *for change of residence,* where a voter, in addition to not having any contact, has failed to return a confirmation postcard and has failed to appear to vote in two subsequent federal elections.  *See* 52 U.S.C. § 20507(b)(2).

Indeed, the statutory language amending the NVRA's list-maintenance provisions includes the heading:

> Sec. 903.  CLARIFICATION OF ABILITY OF ELECTION OFFICIALS TO REMOVE REGISTRANTS FROM OFFICIAL LIST OF VOTERS ON *GROUNDS OF CHANGE OF RESIDENCE.*

116 Stat. 1666, 1728 (2002), P.L. 107-252 (emphasis added). These two statutes prohibit the removal of voters *solely* for not voting. "Solely" means solely. Removal for not voting **plus** not returning the confirmation postcard **plus** not having *any contact* for an additional two federal election cycles is removal "on grounds of change of residency" and is not prohibited. Congress set out a structure, requiring notice, lack of response, and missing two subsequent federal elections. When those conditions are met, *Congress* decided that states may remove a voter from the list of voters "on grounds of change of residence." Sec. 903 of HAVA, section title, 116 Stat. 1666, 1728 (2002), P.L. 107-252.

Nothing in the NVRA prohibits consideration of a voter's voting history as part of a program designed to meet a State's obligations to "make a reasonable effort to remove the names of ineligible voters . . . by reason of . . . (B) a change in the residence of the registrant." 52 U.S.C. § 20507(a)(4). Under Appellants' theory, a registered voter who has no contact with election officials for 100 years cannot be mailed a confirmation postcard. This position is inconsistent with Sec. 8(d) of the NVRA which expressly authorizes *removal* for *change of residence* where a voter fails to return a confirmation postcard and fails to appear for two more federal election cycles. 52 U.S.C. § 20507(d).

**B.      The NVRA incorporates a proximate-cause standard.**

As the district court correctly held, the NVRA does not categorically prohibit States from considering failure-to-vote data.  The NVRA instead incorporates a statute-specific proximate-cause standard that only prohibits States from removing a person's name from a voter-registration list based *solely* on the person's failure to vote.

The proximate-cause standard "is shorthand for the policy-based judgment that not all factual causes contributing to an injury should be legally cognizable causes." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 701 (2011).  Courts have implemented that policy-based judgment with various formulas. *Id.* at 693, 701.  Some have required a "direct relation between the injury asserted and the injurious conduct alleged," and excluded any "link that is too remote, purely contingent, or indirec[t]." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (alteration in original) (citation and internal quotation marks omitted).  Others have applied various tests, including "the immediate or nearest antecedent test; the efficient, producing cause test; the substantial factor test; and the probable, or natural and probable, or foreseeable consequence test." *CSX Transp.*, 564 U.S. at 701 (citations and internal quotation marks omitted).  And still others have "cut off liability if a 'proximate cause' was not the *sole* proximate cause." *Id.* at 693 (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts*

§ 65, p. 452 (5th ed. 1984) (noting the "tendency . . . to look for some single, principal, dominant, 'proximate' cause of every injury")).

The Failure-To-Vote Clause provides that a State's list-maintenance program "shall not *result in* the removal of the name of any person from the official list of voters . . . *by reason of* the person's failure to vote." 52 U.S.C. § 20507(b)(2) (emphasis added). Applying the proper constructions of "result in" and "by reason of," the Failure-To-Vote Clause provides that a State's list-maintenance program "shall not *result in*"—*i.e.,* cause or produce—"the removal of the name of any person from the official list of voters . . . *by reason of*"—*i.e.,* as a proximate cause of—"the person's failure to vote." 52 U.S.C. § 20507(b)(2) (emphasis added). Georgia's list-maintenance process does not "result in" (*i.e.,* cause or produce) the removal of a person's name from the official list of voters "by reason of" (*i.e.,* as a proximate cause of) that person's failure to vote. Removal is not, for instance, *directly related* to a person's failure to vote, because it is *more closely related to* and *purely contingent upon* a person's failure to respond to the address-confirmation notice sent as part of the Address-Confirmation Procedure. A person's failure to respond to the address-confirmation notice is, in other words, the *immediate* and *nearest antecedent* of removal, and a person's failure to vote is in any event not the *sole* proximate cause of removal.

Appellants present an inaccurate ordinary meaning of the term "result" based on an out-of-circuit decision that defined "result" to mean "to proceed or arise as a consequence, effect, or conclusion." Blue Brief at 34[5] (quoting *A. Philip Randolph Institute v. Husted*, 838 F.3d 699, 710 (6th Cir. 2016), cert. granted, 2017 U.S. LEXIS 3506, 2017 WL 515274 (May 30, 2017)). Appellants' definition fails to capture the proper meaning of the term "result in." The ordinary-meaning canon requires courts to "assume the contextually appropriate ordinary meaning" of a term. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 70 (2012); *see also Torres v. Lynch*, 136 S. Ct. 1619, 1625 (2016) (noting that a word "takes on different meanings in different contexts").

Here, Appellants ignore context. They use the definition of the intransitive verb "result," even though the Failure-To-Vote Clause employs the transitive verbal phrase "result in." *See* 52 U.S.C. § 20507(b)(2). The transitive verbal phrase "result in" does not mean "to proceed or arise as a consequence, effect, or conclusion," but instead means "to cause (something) to happen" or "to produce (something) as a result." *Result in*, *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com (July10, 2017); *see also Result in*, *Cambridge Phrasal Verbs Dictionary* (2d ed. 2006) (defining "result in" as "to cause

[5] All page citations are to the ECF page number *not* the page number at the bottom of each page in the brief.

something to happen, or to make a situation exist"); *Result in*, *Oxford Dictionary of Phrasal Verbs* (1st ed. 1993) (defining "result in" as to "have (sth) as an outcome or consequence").

Applying the contextually appropriate ordinary meaning of "result in," the Failure-To-Vote Clause provides that a State's list-maintenance program "shall not *result in*"—*i.e.*, cause or produce—"the removal of the name of any person from the official list of voters . . . *by reason of* the person's failure to vote." 52 U.S.C. § 20507(b)(2) (emphasis added).

Using their inaccurate definition of "result," Appellants argue that Sec. 8(b)(2) "prohibits State programs under which a voter's removal proceeds as a consequence of her failure to vote." *See* Blue Brief at 34–35. Appellants' prohibition incorporates a but-for or factual causation standard into the clause "result in," and they use it to argue that Sec. 8(b)(2) categorically prohibits consideration of failure-to-vote data, unless the optional USPS Safe Harbor Process *and* Address-Confirmation Procedure are used. *See* Blue Brief at 21.

## C. The phrase "by reason of" does not have the same meaning as "results in."

Appellants' interpretation of the Failure-to-Vote Clause also violates the prior construction canon of statutory interpretation because it fails to capture the proper meaning of the clause "result in." Appellants, in fact, rewrite the clause.

Their interpretation inserts the inaccurate definition of "result" where the Failure-To-Vote Clause uses the phrase "by reason of." *Compare* Blue Brief at 34–35, *with* 52 U.S.C. § 20507(b)(2). Appellants turn "result in" into "as a consequence of" when "by reason of" is the "consequence" term in 8(b)(2). Appellants' substitution is unexplained and unwarranted. It is also consequential: "result" does not carry the same meaning as "by reason of." The phrase "by reason of" is a term of art. As the United States Supreme Court has repeatedly held, the phrase incorporates the narrow proximate-cause standard. *See, e.g.*, *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–68 (1992); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529–36 (1983); *see also Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 221–22 (2012). Because the Supreme Court had "settled the meaning of" the phrase before the NVRA was enacted, Congress's "repetition of the same language in" the Failure-To-Vote Clause indicated an "intent to incorporate" that settled meaning. *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). Accordingly, this Court should not accept and substitute Appellants' inaccurate definition of "result" for the term "by reason of" but should look instead to the Supreme Court's pre-NVRA constructions of the term "by reason of" and incorporate the proximate-cause standard into the Failure-To-Vote Clause.

Appellants' use of an inaccurate definition of the term "result" also leads

them to conclude that the Secretary's argument is that O.C.G.A. § 21-2-234 would

have been illegal pre-HAVA. *See* Blue Brief at 43. As will be explained in

Section I.D.., *infra*, the Secretary's (and the district court's) position is that the

Clarification Amendment from HAVA merely clarified that States can use failure

to vote data as part of their list maintenance program but cannot remove a voter

solely for their failure to vote. Using the correct definition of "result in" described

above, Georgia's list maintenance program was legal pre-HAVA as well, and

Congress' 2002 amendment of the NVRA further clarified that such a process

complies with the NVRA.

Using the prior-construction canon to incorporate the proximate-cause

standard into the Failure-To-Vote Clause, the pre-Clarification Amendment NVRA

can be read as a harmonious whole. *See FTC v. Mandel Bros.*, 359 U.S. 385, 389

(1959) (When interpreting a statute, the "task is to fit, if possible, all parts into a

harmonious whole."). With the proximate-cause standard incorporated, the

Failure-To-Vote Clause rests harmoniously alongside the Address-Confirmation

Procedure. Indeed, even within the Address-Confirmation Procedure, removal is

not *directly related to* a person's failure to vote, because it is *more closely related*

*to* and *purely contingent upon* a person's failure to respond to the address-

confirmation notice and a person's failure to vote is in any event not the *sole* proximate cause of removal.

### D. The Clarification Amendment is a proviso and not and not an exception to a general prohibition.

The Clarification Amendment also fits comfortably with that construction because it is a proviso that clarifies the meaning of the immediately preceding and previously enacted Failure-To-Vote Clause.  To be sure, it begins with the phrase "except that," 52 U.S.C. § 20507(b)(2), which might suggest that the amendment should be read as an exception to a general prohibition.  But the phrase misleads. In fact, because poor drafting is common, the "particular form of the words used to introduce the applicable provision generally does not determine whether it should be classed a proviso or an exception."  1A *Sutherland Statutory Construction* § 21:11 (7th ed.).  Instead, the function of a provision determines whether it is a proviso or an exception.

Although "there are a great many examples where the distinction is disregarded and where the words are used as if they were of the same signification," there is a "technical distinction between an exception and a proviso."  *United States v. Cook*, 84 U.S. 168, 177 (1872) (footnote omitted).  "A true statutory exception exists only to exempt something which would otherwise be covered by an act."  2A *Sutherland Statutory Construction* § 47:11 (7th ed.).

Provisos, by contrast, function as rules of construction and are thus "commonly used to limit, restrain, or otherwise modify the language of the enacting clause." *Quackenbush v. United States*, 177 U.S. 20, 26 (1900); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 154 (2012) (noting that a proviso "modifies the immediately preceding language").

By that standard, the Clarification Amendment is a proviso. Its plain language confirms that it functions as a rule of construction. It provides that "nothing in [the Failure-To-Vote Clause] *may be construed* to prohibit" certain conduct. 52 U.S.C. § 20507(b)(2) (emphasis added). In addition, the amendment was plainly intended to be a rule of construction that clarified the meaning of the Failure-To-Vote Clause. As enacted, the heading that preceded the amendment read, "*clarification* of ability of election officials to remove registrants from official list of voters on grounds of change of residence." Help America Vote Act of 2002, Pub. L. 107-252, 116 Stat. 1666, 1728 (emphasis added) (capitalization omitted); *see also* H.R. Rep. No. 107-730, pt. 1, at 81 (2002).

With the Clarification Amendment, Congress clarified a perceived tension between Sections 8(b) and 8(d). Section 8(b) provided that a state's list maintenance program should "not result in the removal . . . by reason of a person's failure to vote," and Section 8(d) provides that a voter's name may be removed, *for a change in residence*, if a voter fails to return the confirmation postcard and fails

24

to vote for two more federal elections. Sec. 8(d)(1). The 2002 amendment clarifies that the prohibition in Section 8(b) does not prohibit removal, *for a change in residence*, where the safeguards in Section 8(d), i.e., sending a confirmation postcard and waiting two additional federal election cycles, have been met.

The Failure-To-Vote Clause does not prohibit—and per the Clarification Amendment cannot be construed to prohibit—a State from considering a person's failure to vote if the State also considers the person's failure to respond to an address-confirmation notice. That is, after all, the Address-Confirmation Procedure.

The Failure-To-Vote Clause thus only prohibits—and per the Clarification Amendment may only be construed to prohibit—a State from relying *solely* on failure-to-vote data. That reading is consistent with the common-law formulation of the proximate-cause standard that "cut off liability if a 'proximate cause' was not the *sole* proximate cause," *CSX Transp.*, 564 U.S. at 693 (citation omitted), and is confirmed by the HAVA, which expressly states the proximate-cause standard in those terms: "no registrant may be removed *solely by reason of* a failure to vote," 52 U.S.C. § 21083(a)(4)(A) (emphasis added); *see Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (noting that the *in pari materia* canon provides that

statutes that "pertain to the same subject" should be read "as if they were one law" (citation omitted)).

### E. Appellants misconstrue the structure of Sec. 8.

As the district court held, the NVRA is silent as to the criteria States can use to "trigger" the Address-Confirmation Procedure, so long as the criteria are "uniform, nondiscriminatory, and in compliance with the Voting Rights Act . . . ." *See* 52 U.S.C. § 20507(b)(1). Now, Appellants argue (1) that Sec. 8(a)(4)(B), requires that any trigger must "comply" with subsections (b), (c), and (d) of Sec. 8 to remove voters because of a change in residence; and (2) that the district court incorrectly concluded that Sec. 8(d) is a safe harbor unto itself, meaning that a State need only comply with this provision to comply with the NVRA.

The Court should reject Appellants' new arguments. First, Sec. 8(a)(4)(B) does not require that States must "comply" with subsections (b), (c), and (d) of Sec. 8. The provision actually states that removal because of a change in residence must be in "in accordance with" these subsections. While "comply" and "in accordance with" are similar terms, they are not interchangeable: "comply" means "to conform, submit, or adapt," whereas, "in accordance with" means "in a way that agrees with or follows." *Comply; In Accordance With*, *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com (July 7, 2017). By inserting "comply" in place of "in accordance with," Appellants' interpretation requires a

stricter compliance threshold because States would have to conform to each aspect of subsections (b), (c), and (d) to remove voters because of a change in residence. Using the term "in accordance with" from the statute, however, States must only ensure that their list maintenance programs agree with or follow the provisions of subsections (b), (c), and (d); thus, requiring only that the portions of States' list maintenance programs that implicate the requirements in subsections (b), (c), and (d) follow those requirements. This reading also comports with the fact that one of the major provisions in these subsections, the USPS Safe-Harbor Process in subsection (c), is explicitly permissive. In sum, Sec. 8 (a)(4) leaves it to the States to create their own list maintenance programs, so long as the programs are *in accordance with* subsections (b), (c), and (d).

Appellants also incorrectly argue that the district court concluded that the Address-Confirmation Process in Sec. 8(d) is a safe harbor on its own for list maintenance programs. Not only did the district court not reach this conclusion, but Appellants' argument ignores the fact that the primary requirement in Sec. 8 for list maintenance programs (and the requirement that the district court identified) is that such programs be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act . . . ." 52 U.S.C. § 20507(b)(1); R-34 at 13. Thus, as long as the trigger that a State uses to send a confirmation postcard satisfies this standard, and the State then follows the Address-Confirmation

Procedure in Sec. 8(d), the trigger will not run afoul of the NVRA. Furthermore, Sec. 8(b)(2)(B) explicitly allows States to consider whether an individual "has not voted or appeared to vote in 2 or more consecutive general election for federal office" entirely apart from the Address-Confirmation Procedure in Sec. 8(d). The district court held that O.C.G.A. § 21-2-234 met the standard in Sec. 8(b)(1), and this Court should affirm that decision.

        i.       *Use of the USPS Safe Harbor Process is optional*.

Georgia's list maintenance program includes two triggers to start the Address-Confirmation Procedure in Sec. 8(d): (1) the USPS notice of change of address program for voters who move out of a jurisdiction under O.C.G.A. § 21-2-233; and (2) the no-contact provisions in O.C.G.A. § 21-2-334. Appellants argue that under Sec. 8(b), the Clarification Amendment, States can only consider a voter's failure to return a confirmation postcard and appear to vote, as set forth in Sec. 8(d), together with the USPS Safe-Harbor Process in Sec. 8(c). Blue Brief at 44. In other words, Appellants argue that the Clarification Amendment is limited to those list maintenance programs that rely on the safe harbor procedures set out in Sec. 8(c). However, Sec. 8(c) describes only one possible voter removal program, use of change-of-address information supplied by the Postal Service, that a State could adopt in satisfaction of that State's obligation to conduct a program

of list maintenance under Sec. 8(a)(4) of the NVRA (i.e., the USPS Safe-Harbor Process).

Appellants recognize that interpreting the Failure-To-Vote Clause to categorically prohibit consideration of failure-to-vote data led to a conflict because the Address-Confirmation Procedure affirmatively requires consideration of failure-to-vote data. *See* Blue Brief at 46. Appellants argue that Congress enacted the Clarification Amendment in HAVA to confirm that "the Failure-to-Vote Prohibition does not prevent States from considering failure to vote *when they use* the USPS Safe Harbor Procedure ***and*** the Address-Confirmation Procedure." *Id.* at 37 (emphasis in original).

Appellants' line of reasoning contains an obvious flaw: it is anachronistic. As enacted in 1993, the NVRA included both the Failure-To-Vote Clause and the Confirmation Procedure. *See* National Voter Registration Act of 1993, Pub. L. 103-31, 107 Stat. 77, 83–84. The Clarification Amendment, however, was not introduced into the NVRA until 2002. *See* Help America Vote Act of 2002, Pub. L. 107-252, 116 Stat. 1666, 1728. Accordingly, under Appellants' reading, from 1993 until 2002, the Failure-To-Vote Clause categorically prohibited conduct that the Confirmation Procedure affirmatively required, and the conflict between those two provisions was open and irreconcilable.

Under a proper reading of the statute, there was not an open and irreconcilable conflict between the Failure-To-Vote Clause and the Confirmation Procedure from 1993 to 2002. Appellants' explanation for the Clarification Amendment fails because they do not attempt to fit all parts of the as-enacted NVRA into a harmonious whole. *See Mandel Bros.*, 359 U.S. at 389(When interpreting a statute, the "task is to fit, if possible, all parts into a harmonious whole."). This Court should not accept Appellants' flawed reasoning. Instead, as shown above, using the prior-construction canon to incorporate the proximate-cause standard into the Failure-To-Vote Clause, the pre-Clarification Amendment NVRA can be read as a harmonious whole. With the proximate-cause standard incorporated, the Failure-To-Vote Clause rests harmoniously alongside the Address-Confirmation Procedure.

While the district court did not explicitly perform the statutory interpretation analysis of using the interpretive-harmony canon by incorporating the proximate-cause standard into the Failure-To-Vote Clause, this analysis vindicates the court's ultimate conclusion that Georgia's list maintenance program does not violate the NVRA. That follows because, as shown above, Georgia's list-maintenance process does not result in (*i.e.*, cause or produce) the removal of a person's name from the official list of voters "by reason of" (*i.e.*, as a proximate cause of) that person's failure to vote. *See* Section I.B., *supra*.

30

Appellants' position also misapprehends both the plain text of Sec. 8(c) and the language in both the House and Senate Reports preceding the NVRA. See H.R. REP. NO. 103-9, at 15 (1993), as reprinted in 1993 U.S.C.C.A.N. 105, 119 (1993); S. REP. NO. 103-6, at 32 (1993). First, under the actual language in Sec. 8(c)(1), a State may use the USPS Safe-Harbor Process to meet the NVRA's requirement that each state establish a voter roll maintenance program to remove voters for a change in residence, but this process is not mandatory: "A State may meet the requirement of subsection (a)(4) by establishing a program under which — (A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed . . . ." § 20507(c)(1)(A) (emphasis added).

Second, both the House and Senate Reports state that the USPS Safe-Harbor Process in subsection (c) is merely meant "to provide some guidance to the States" on how they can meet the NVRA's requirement in §20507(a)(4) (as currently codified) that states must establish a program to remove the names of ineligible voters from official voter lists by reason of death or a change in residence. H.R. REP. NO. 103-9 at 15; S. REP. NO. 103-6 at 32. The House and Senate Reports further state that a maintenance program's use of the U.S. Postal Service's National Change of Address database "could be deemed to be in compliance with

the requirements that the program be uniform, nondiscriminatory and in compliance with the Voting Rights Act of 1965." *Id.*

   ii.   *Appellants ignore the legislative history of Sec. 8(b).*

Even if the language of the NVRA were not clear, congressional intent in 2002 was clear. Senator Dodd, the principal Senate author of the Help America Vote Act 2002 Conference Report, described how the provisions for list maintenance are meant to maintain accurate, clean voter registration lists.

> The conference report retains the Senate-passed provisions of section 303(a)(2) regarding list maintenance of the computerized list. Those provisions provide that any name that is removed from the list must . . . [not] have responded to a notice mailed by the appropriate election official and then have not voted in the subsequent two Federal general elections.
>
>   . . .
>
> While many of us have read of allegations of massive duplicate registrations, the fact is that even though alleged duplicate names appear on more than one jurisdiction's list, the vast majority of voters only live in one place and only vote in one place. In a highly mobile society likes [sic] ours, voters move constantly.
>
>   . . .
>
> The conference report also added a new minimum standard for ensuring the accuracy of the centralized computerized registration list. . . . Consistent with section 303(a)(2), this provision parallels language in the NVRA that requires States to make a reasonable effort to remove registrants who are ineligible to vote, consistent with the provisions of NVRA, specifically the requirement that such voters fail to respond to a notice and then fail to vote in the subsequent two general Federal elections.

148 Cong. Rec. S10509 (daily ed. Oct. 16, 2002) (statement of Sen. Dodd).

Georgia's list maintenance program is consistent with this congressional mandate

and consistent with the Supreme Court's recognition that "[i]n the [NVRA],

Congress established procedures that would both increase the number of registered

voters *and* protect the integrity of the electoral process." *Crawford v. Marion

County Election Bd.*, 553 U.S. 181, 192 (2008). Appellants' interpretation would

undercut both of these goals because it would prevent the State from using failure

to vote data to fill in the gaps in the USPS notice of change of address program

while also preventing voters from using contact at the polls as a method to alert the

State that they remain at their registered address. This method is needed because

according to the U.S. Postal Service, "[a]s many as 40 percent of people who move

do not inform the Postal Service" of that fact. U.S. Postal Serv., Office of the

Inspector Gen., Report No. MS-MA-15-006, Strategies for Reducing

Undeliverable as Addressed Mail 15 (May 1, 2015), https://goo.gl/vOyQDl.

Because so many people fail to submit a change-of-address form to the U.S. Postal

Service, the USPS Safe-Harbor Process proves inadequate. Based on the U.S.

Postal Service's own data, the Safe-Harbor Process captures, at best, 60 percent of

people who move. *Id.* Georgia's supplemental process is necessary to pick up

where the USPS Safe-Harbor Process leaves off and serves as an effective tool for

maintaining an accurate voter-registration list.

In passing HAVA, Congress was concerned about cleaning up voter

registration lists and with protecting registered voters who were eligible to vote.

> Election officials shall perform list maintenance with respect to the
> computerized list on a regular basis. If individuals are to be removed
> from the computerized list, they shall be removed in accordance with
> the provisions of NVRA. Consistent with NVRA, registrants who
> have not responded to a notice and have not voted in two consecutive
> general elections for federal office *shall be removed* from the official
> list of registered voters except that no registration may be removed
> *solely* by reason of failure to vote.

H.R. Rep. No. 107-730, at 75 (2002) (Conf. Rep.). Appellants' reading of Sec.

8(b) of the NVRA is inconsistent with the mandate in HAVA. Congress amended

the NVRA to make clear that nothing in the NVRA prohibits the mandate

contained in HAVA.

Most importantly, the Committee Report clarifies that the 2002 Clarification

Amendment to the NVRA,

> amends the National Voter Registration Act of 1993 to clarify the
> ability of election officials to remove from the voter registration list
> the name of an individual who has not responded to a notice from the
> registrar of voters and who has not voted in two or more consecutive
> general elections for Federal office.

*Id.* at 81.  Appellants' interpretation of Sec. 8(b) of the NVRA is inconsistent with

the voter registration list problems that Congress was addressing in 2002 when

enacting HAVA and adding the Clarification Amendment to the NVRA.

> **F.     The Department of Justice's 1994 objection, pursuant to
> Section 5 of the Voting Rights Act, to Georgia's former statute,
> has no relevance to whether current Georgia law violates the
> current language of the NVRA.**

Appellants continue on appeal to draw attention to a 1994 objection from the

U.S. Department of Justice, under Sec. 5 of the Voting Rights Act, 52 U.S.C.

10304, *formerly* 42 U.S.C. 1973c, to provisions of Act No. 1207, 1994 Ga. Laws

1443.  Blue Brief at 35–36.  The legislation consisted of Georgia's initial

implementation of the NVRA.[6]  In the district court, Appellants suggested that

Secretary Kemp has been enforcing this law despite the Department of Justice's

objection.  R-1 ¶¶ 27–29.  Contrary to Appellants' assertion, in 1997, the Georgia

Legislature amended the Georgia election code, striking the prior versions of

O.C.G.A. §§ 21-2-234 and 21-2-235 in their entirety and replacing them with new

statutory language.  1997 Ga. Laws 649, 650-653.  The 1997 statute was precleared

by the Department of Justice on July 29, 1997.  *See* R-10-2.  The preclearance

letter from the Department of Justice describes the legislation being reviewed as

---

[6] The Department of Justice objected to Georgia's former procedures for removing
voters from registration lists.  *Id.*  These old procedures were codified at former
O.C.G.A. § 21-2-234 (1994), 1994 Ga. Laws 1443.

changes to "[p]rocedures for voter registration list maintenance, including *revised* procedures for the placement of registrants on an inactive registration list and the removal of names from the list of eligible registered voters." R-10-2 at 1 (emphasis added). Thus, the concerns the Department of Justice had with the 1994 legislation were remedied by the 1997 legislation, which is the law currently in effect. *See* O.C.G.A. §§ 21-2-234 and 21-2-235. Moreover, the Department of Justice's 1994 objection provided the Department's interpretation of the NVRA *prior to* passage of HAVA, which amended Sec. 8(b) of the NVRA in 2002. After the amendment, it is clear that states *may* remove from their lists voters who have been sent a notice, fail to return it, *and* subsequently fail to vote in two subsequent federal elections. Therefore, Appellants' reliance on the Department of Justice's 1994 objection to Georgia's *former* statute provides no support for their position that current Georgia law violates the NVRA, as amended.

## II. Georgia's list-maintenance provisions do not violate the First Amendment.

The district court correctly held that O.C.G.A. § 21-2-234 does not violate the First Amendment. Appellants claim that they have a right *not* to vote, but the only support they provide for this right is the Senate Report for the NVRA and an

out-of-circuit decision that analyzed a right not to vote in the alternative. [7]

Furthermore, Appellants argue that the district court should have applied a constitutional standard that has never been applied to a statute regulating voter conduct and is inapplicable to the claimed right not to vote, if such a right even existed. The district court recognized all of these shortcomings in Appellants' First Amendment claim. R-34 at 16–18. Nevertheless, the court still analyzed the claim using each of the parties' proposed standards and correctly held that applying any of the proposed standards, O.C.G.A. § 21-2-234 passed constitutional muster.

### A. Georgia's list maintenance program does not unconstitutionally interfere with Appellants' asserted right to both not vote and remain on Georgia's voter registration list.

Georgia's list-maintenance provisions do not actually interfere with the rights Appellants actually assert. They contend that Georgia's list-maintenance provisions require them to choose to either vote and remain on Georgia's voter-registration list, or refrain from voting and be removed from the list. Thus, the right they really assert is a right not to vote *and* to remain on Georgia's voter registration list. However, Georgia's list-maintenance program does not require any voter to vote to remain on the statewide voter-registration list. That program

---

[7] In the district court, Appellants cited only the *dissenting* opinion in *Colon-Marrero v. County-Perez*, 703 F.3d 134, 145 (1st Cir. 2012), in support of their contention that there is a constitutional right not to vote. They no longer rely on this case, but instead primarily rely on the Senate Report from the NVRA and a tortured reading of a Fourth Circuit opinion. *See* Blue Brief at 50.

requires only that voters either have contact with election officials once every four election cycles or respond to a postage-prepaid postcard inquiring about their residence.

However, even if the list-maintenance provisions burdened Appellants' asserted right, a requirement to send a confirmation postcard or have some contact with election officials once every three years is reasonable and viewpoint neutral. Even assuming that O.C.G.A. § 21-2-234 interferes with a First Amendment right not to vote, and that voters have such a right, Appellants have not shown that O.C.G.A. § 21-2-234 requires a registered voter to vote. *See* R-34 at 17 (noting that the statute does not compel anyone to vote). Any registered voter is free not to vote in any election they so desire. Thus, there is no interference with the claimed First Amendment right not to vote. *Hoffman v. Maryland*, 928 F.2d 646, 648 (4th Cir. 1991) (explaining that "even if there is a right not to vote of constitutional significance, it is not infringed upon by [a State's] purge statute.").

**B.**     **Even assuming Appellants have a right not the vote, the district court correctly held that Georgia law does not infringe on Appellants' First Amendment rights.**

The district court assumed *arguendo* that a right not to vote exists and analyzed O.C.G.A. § 21-2-234 using three different constitutional standards. The court correctly concluded that the statute does not violate Appellants' First Amendment rights under any of the standards.

i.  *The proper standard for analyzing whether a statute infringes on voting rights is the Supreme Court's* Anderson-Burdick *balancing test.*

Although the district court agreed with the Fourth Circuit's opinion in *Hoffman* that voter-removal statutes should be analyzed using a time, place, and manner test, this Court should apply the *Anderson-Burdick* balancing test, which applies to election laws that burden the right to vote (rather than Appellants' claimed right not to vote).  Under the *Anderson-Burdick* framework, "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmuspaper test' that will separate valid from invalid restrictions." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  In *Burdick*, the Supreme Court reaffirmed *Anderson*'s requirement that a court evaluating a constitutional challenge to an election regulation must weigh the asserted injury to the right to vote against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Under this test, "[courts] weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (internal citations and quotation marks omitted).  The Court has recognized

that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). "Regulations imposing severe burdens on Appellants' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434).

Despite favoring a time, place, and manner test, the district court also correctly applied the *Anderson-Burdick* standard. As the district court concluded, Georgia's regulatory scheme is only a "lesser" or "limited" burden. The statute is also "reasonable and nondiscriminatory." Accordingly, the statute passes the *Anderson-Burdick* balancing test. *See* R-34 at 20. Further, even under a "severe" burden analysis, the statute is constitutional because Georgia has a compelling interest in maintaining accurate voter registration lists as required by federal law.

ii. *O.C.G.A. § 21-2-234 also passes a forum-based analysis.*

The district court also correctly concluded that O.C.G.A. § 21-2-234 passes a forum-based analysis because presence on voter rolls should be considered, at most, a non-public or limited public forum, and Georgia's statute is reasonable and viewpoint-neutral. R-34 at 20. Under a forum-based analysis, "the government's

40

power to restrict speech 'depends on the nature of the relevant forum' at issue."

*Keeton v. Anderson-Wiley*, 664 F.3d 865, 871 (11th Cir. 2011) (quoting *Cornelius*

*v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

> Even protected speech is not equally permissible in all places and at
> all times. Nothing in the Constitution requires the Government freely
> to grant access to all who wish to exercise their right to free speech on
> every type of Government property without regard to the nature of the
> property or to the disruption that might be caused by the speaker's
> activities.

*Cornelius*, 473 U.S. at 799–800. In *Cornelius* the Court explained that "in defining

the forum [the Court has] focused on the access sought by the speaker." *Id.* at 801.

The Supreme Court has identified three categories of forums.

> First, in traditional public forums, such as public streets and parks,
> "any restriction based on the content of . . . speech must satisfy strict
> scrutiny, that is, the restriction must be narrowly tailored to serve a
> compelling government interest." *Pleasant Grove City v. Summum*,
> 555 U.S. 460, 469, 129 S. Ct. 1125, 172 L. Ed. 2d 853, 862 (2009).
> Second, governmental entities create designated public forums when
> "government property that has not traditionally been regarded as a
> public forum is intentionally opened up for that purpose"; speech
> restrictions in such a forum "are subject to the same strict scrutiny as
> restrictions in a traditional public forum." *Id.*, at 469-470, 129 S. Ct.
> 1125, 172 L. Ed. 2d 853, 858. Third, governmental entities establish
> limited public forums by opening property "limited to use by certain
> groups or dedicated solely to the discussion of certain subjects." *Id.*, at
> 470, 129 S. Ct. 1125, 172 L. Ed. 2d 853, 858. As noted in text, "[i]n
> such a forum, a governmental entity may impose restrictions on
> speech that are reasonable and viewpoint-neutral." *Ibid.*

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 n. 11 (2010).[8]

Here, the voter-registration lists would be at best a non-public or limited public forum. The voter-registration lists are not maintained for the purpose of public expression. Rather, they are maintained for use by election officials in the administration of elections. Therefore, the restrictions need only be reasonable and viewpoint neutral. *Cornelius*, 473 U.S. at 806; *Martinez*, 561 U.S. at 679 n. 11. Section 21-2-234 easily passes both a reasonable and a viewpoint-neutral test. All voters, regardless of viewpoint, must have contact with registration officials once every three years *or* return a postage prepaid confirmation post card. Georgia is required, pursuant to both HAVA and the NVRA to maintain accurate voter registration lists. O.C.G.A. § 21-2-234 is a reasonable legislative measure designed to accomplish those goals, as the district court correctly held.

      iii.    *Appellants' reliance on* Hoffman *to argue that the* O'Brien *speech/non-speech test should apply here is misplaced.*

Appellants erroneously rely on the Fourth Circuit's decision in *Hoffman* to argue that there is a First Amendment right not to vote and that a four-part speech/non-speech test from *United States v. O'Brien*, 391 U.S. 367, 377 (1968),

---

[8] The Court has at times referred to a limited public forum as a non-public forum. *See Cornelius*, 473 U.S. at 805.

should be used to determine whether a statute infringes on this claimed right. Blue Brief at 52. First, *Hoffman* never establishes such a right. Rather, the Fourth Circuit, in rejecting a First Amendment challenge to Maryland's list-maintenance statute, premised on a right not to vote, and without deciding whether such a right exists, concluded that such laws do *not* violate any such First Amendment right. *Hoffman*, 928 F.2d at 648. Moreover, as stated above, Georgia's law does not require anyone to vote in order to remain on the registration rolls. Rather, voters must simply confirm, either through a confirmation postcard or by some other contact with election officials, their registration once every four federal election cycles.

Second, Appellants cannot rely on *Hoffman* for the conclusion that the act of being registered but not voting expresses discontent with the candidates. Blue Brief at 52. The *Hoffman* court did not reach this conclusion. Instead, the language that Appellants quote is simply the court's reiteration of the plaintiffs' arguments in that case. *Hoffman*, 928 F.2d at 648 ("This action of being registered but not voting, they claim, expresses their discontent with the candidates because the State announces the number of voters registered to vote but who did not."). The court then explicitly stated that it was not deciding whether such a right to express voter discontent in this way exists. *Id.* ("Assuming for argument that such a First Amendment right exists, a question we do not decide . . . ."). *Hoffman* does

not support the notion that removal statutes infringe on a First Amendment right to be registered but not vote.

Finally, while *Hoffman* referenced the four-part test from *O'Brien* that Appellants insist the district court should have applied, the Fourth Circuit did not straightforwardly apply this test to its theoretical analysis of a right not to vote. Instead, that court applied a different standard. The court held that "the act of not voting when registered involves, at the very least, both speech and non-speech." *Hoffman*, 928 F.2d at 648. The court held that "[w]here both [speech and non-speech] elements are involved, a regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (citing *O'Brien*, 391 U.S. at 377). The court then pointed out that the *O'Brien* test was *analogous to* a time, place, and manner restriction. *Id.* (citing *Clark v. Community for Creative Nonviolence*, 468 U.S. 288, 298 (1984)). Under this standard, regulations need only be "designed to serve a substantial governmental interest and [ ] not unreasonably limit alternative avenues of communication." *Id.* at 648–649 (quoting *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47 (1986)).

44

Applying this time, place, and manner standard here, the district court correctly held that Georgia's statute serves the State's substantial governmental interest in maintaining accurate voter registration rolls, as required under the NVRA and HAVA. R-34 at 19. Like the Maryland statute in *Hoffman*, the Georgia statute,

> does not unreasonably limit alternate avenues of communication. . . . the statute [does not] block[] other means of communicating . . . [and] nothing prevents the affected party from re-registering and then choosing not to vote to express [his message]. . . . Even considering that re-registration may be somewhat burdensome, it is a small price to pay for the prevention of vote fraud. *See Rosario v. Rockefeller*, 410 U.S. 752, 761, 36 L. Ed. 2d 1, 93 S. Ct. 1245 (1973).

*Hoffman*, 928 F.2d at 649. Even if this Court determines that O.C.G.A. § 21-2-234 should be analyzed as a time, place, and manner restriction, it should not follow Appellants' misplaced application of the *O'Brien* test.

### C. The district court correctly dismissed the complaint prior to hearing evidence.

Appellants argue that discovery is needed before the district court can analyze their First Amendment claim, but in support of their position, they misconstrue both the use of O.C.G.A. § 21-2-234 and the mechanics of how the statute is applied. First, Appellants argue that § 21-2-234 is merely duplicative of the USPS address-confirmation procedure in O.C.G.A. § 21-2-233 (Georgia's use of the USPS notice of change of address program). However, they do not address

the fact that § 21-2-234 supplements § 21-2-233 because it serves the State's

interest in ensuring that all changes of address are reflected in its voter registration

rolls, not just those individuals who *choose* to use the USPS change of address

program. *See* U.S. Postal Serv., Office of the Inspector Gen., Report No. MS-

MA-15-006, Strategies for Reducing Undeliverable as Addressed Mail 15 (May 1,

2015), https://goo.gl/vOyQDl ("As many as 40 percent of people who move do not

inform the Postal Service" of that fact.).

Second, Appellants misrepresent the mechanics of Section 21-2-234,

arguing that the statute "removes voters who have not voted for three years." Blue

Brief at 54 n.11. Section 21-2-234 does not remove voters who have not voted for

three years. As explained above, voters are only removed from Georgia's voter

registration list if they have not had *any contact* with election officials in Georgia

for a minimum of seven years, including four federal election cycles, *and* they

have not returned a postage prepaid, preaddressed return card to confirm their

residence. O.C.G.A. §§ 21-2-234, 21-2-235; *see also* STATEMENT OF THE CASE,

*supra.*

Under Appellants' theory, no First Amendment claim should be dismissed

prior to discovery. They cite a litany of First Amendment cases that were

adjudicated after discovery commenced as proof that all such cases must proceed

to discovery. Yet, they do not cite to any case that exempts First Amendment

cases from Fed. R. Civ. Proc. 12(b)(6), and there is none.  In particular, Appellants complain that the district court concluded that the "maintenance of accurate voter registration rolls is a substantial governmental interest" without discovery.  *See* Blue Brief at 55 (quoting R-34 at 19).  No evidence is needed to reach this conclusion because the Supreme Court has recognized this interest.  *See, e.g., Martson v. Lewis*, 410 U.S. 679, 680 (1973) (recognizing that "States have valid and sufficient interests in providing some period of time – prior to an election – in order to prepare adequate voter records and protect its electoral processes from possible fraud.").  More importantly, the drafters of the NVRA and HAVA made clear that maintaining accurate voter registration rolls was an explicit purpose for the statutes.  *See* H.R. REP. NO. 103-9 at 15; S. REP. NO. 103-6 at 32 (requiring that states must establish a program to remove the names of ineligible voters from official voter lists by reason of death or a change in residence); 148 Cong. Rec. S10509 (describing how HAVA added "a new minimum standard for ensuring the accuracy of the centralized computerized registration list.").  No amount of discovery would change this conclusion, and the district court was right to rely on the cases and legislative history that support it.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's order should be affirmed.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General                            112505

ANNETTE M. COWART              191199
Deputy Attorney General

RUSSELL D. WILLARD             760280
Senior Assistant Attorney General

CRISTINA CORREIA                   188620
Assistant Attorney General

/s/Josiah B. Heidt
JOSIAH B. HEIDT                       104183
Assistant Attorney General

Attorneys for Appellee

Please address all
Communication to:
CRISTINA CORREIA
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063

48

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of FRAP 32(a)(7)(B) because this brief contains 12,496 words according to the word processing system utilized by the Office of the Attorney General.

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because this brief has been prepared Times New Roman 14-point font.


/s/Josiah B. Heidt_____
Josiah B. Heidt
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2017, I electronically filed the foregoing

**BRIEF OF APPELLEE** with the Eleventh Circuit Court of Appeals using the

CM/ECF system which will which will automatically send email notification of

such filing to the following attorneys of record:

> Emmet J. Bondurant, II
> Jason J. Carter
> Chad K. Lennon
> Bondurant, Mixson & Elmore LLP
> 3900 One Atlantic Center
> 1201 West Peachtree St. NW
> Atlanta, GA  30309
>
> Sophia Lin Lakin
> Dale E. Ho
> ACLU Foundation, Inc.
> 125 Broad Street, 18th Floor
> New York, NY  10004
>
> Naila S. Awan
> Demos
> 80 Broad Street, Ste 4
> New York, NY  10004
>
> Sean J. Young
> ACLU of Georgia
> P.O. Box 77208
> Atlanta, GA  33057

This 19th day of July, 2017.

/s/Josiah B. Heidt
Josiah B. Heidt        104183
Assistant Attorney General